IN RE ADOPTION OF JO ANN WATSON, A MINOR. GUS WATSON AND GEORGIANNA WATSON, HIS WIFE, PETITIONERS, APPELLANTS, v. LORAINE WATSON, RESPONDENT.—195 S. W. (2d) 331.

St. Louis Court of Appeals. Opinion filed June 18, 1946.

*F. D. Wilkins* for appellants.

*May & May* for respondent.

ANDERSON, J.—In this action Gus Watson and his wife Georgianna filed a petition in the Juvenile Division of the Circuit Court of Pike County to adopt Jo Ann Watson, then four years of age. The mother of the child, Loraine Watson, opposed the action. From a judgment denying the relief asked, petitioners have appealed.

All the parties to this action are negroes. Jo Ann Watson is the illegitimate daughter of Loraine Watson. Gus Watson is an uncle of Loraine Watson. He and his wife live in Clarksville, Missouri. They are middle-aged and have no children of their own. They are a highly respectable couple, enjoy the confidence and respect of their fellow citizens, and their fitness to rear Jo Ann Watson is unquestioned.

Loraine Watson, the respondent, is unmarried, and the mother of two illegitimate children, Jo Ann Watson, born April 18, 1941, and a little boy, about six years of age. At the time of the hearing be-

low, Loraine Watson was twenty-three years of age, and was making her home and residing in Hannibal, Missouri, with a family named Anderson, and was employed at the International Shoe factory, earning $29.50 per week. At the time Jo Ann was born, the mother was living with the Andersons on a farm at Salt River, near Frankford. She was not employed at the time. In September, 1942, the child was turned over to the petitioners. Mrs. Watson testified that just before she took the child, she received a card from Loraine, which read: "Dear Auntie, will you take one of the children and give it a home? . . . I got to a place and I can't support it." Mrs. Watson and her husband then went to the Anderson home, and when they arrived asked Loraine which one of the children she wanted them to take. Loraine replied: "Aunt Georgianna, I would rather for you to take them both." Mrs. Watson felt that she could not take both children, but told Loraine she would take one of them and give it a home, and it was finally decided that she would take the little girl Jo Ann.

Loraine testified that she did not write to Mrs. Watson requesting her to take one of the children, but when Mr. and Mrs. Watson came she told them to take the little girl until she came for her. She testified: "She said she would like to have the little girl, and she begged for the little girl, and I said, 'Well take her and keep her a while.'" Mrs. Anderson, who was present at the time, testified: "Loraine said, 'Take the child and keep her until I call for her.'" The child was then taken to the Watson home in Clarksville. The little boy was given to another aunt of Loraine's.

A few months later, about January 1, 1943, the Andersons moved to Hannibal. Loraine went with them and secured a position in the factory of the International Shoe Company. Her wages, "after Social Security and all is taken out," were $25 per week. Out of this she arranged to pay the Andersons $5 per week for herself and child. After appellants took the child, respondent went to see the child three times. On her first visit, she stayed two weeks; on the second visit, one week; and on the third visit, three or four days. In April, 1944, she sought to regain custody of her child. Mrs. Watson at first refused; but after Loraine kept begging, she wrote to Loraine consenting to a visit for one week. However, when the latter went for the child, she was not permitted to take her. But, in July, Mrs. Watson wrote a letter to the mother telling her she could have the child for one week. Loraine then went to Clarksville, secured possession of the child, and took her to Hannibal. Loraine testified:

"Q. And you promised to bring the child back, didn't you, and you didn't do it? A. No, sir. I didn't— it was my child."

The child was not returned to the Watsons at the end of the week, and after she had been with her mother for four or five weeks, the

Watsons went to Hannibal to get her. The Watsons testified that Loraine at the time refused to surrender the child to them, and requested that the child be permitted to stay with her a little longer. The Watsons granted this request, and returned to Clarksville. About a week later the Watsons again went to Hannibal to get the child. This time they appealed to the police. Loraine was brought to the police station, and according to Mrs. Watson's testimony, Loraine stated that she was going to bring the child back, but would like to keep her two weeks longer. The Watsons then again returned to Clarksville without the child.

At the end of the two weeks, the Watsons again went to Hannibal to secure possession of the child. This time they took a lawyer, Mr. Juett, with them. Mrs. Watson testified:

"Q. . . . The mother was there? A. Yes, sir.

"Q. And you said you wanted the child? A. Yes, sir.

"Q. And the mother told you she wouldn't let you have her? A. Yes, sir.

"Q. That she was hers? A. That is right."

Loraine testified that on this occasion they wanted to take the child "and I didn't want her to go and she said, 'If you don't let her go I will take her.' I said, 'I would be willing to pay you for the time you had the child,' and she said she 'wanted all the money for her keep or she would take the child.' So she came up and I wasn't going to let the child go and I wanted to pay her for the child but I couldn't pay all at once, but she didn't want to do that."

After Loraine's refusal to part with her child, Mrs. Watson took the child by force and carried her off to Clarksville where she has ever since remained.

After her child was taken from her, Loraine reported the matter to the police. The police sent her to the prosecuting attorney. She saw the latter on two occasions, but he did nothing about it. About three weeks later, she enlisted the aid of the Sheriff of Pike County, who went with her to Clarksville. They met Mrs. Watson coming home from work. The Sheriff asked Mrs. Watson where the little girl was, and the latter replied that she was in Eolia. The child was not in Eolia at the time, but at the home of petitioners. When asked why she did not tell the truth at the time, Mrs. Watson said she was scared and did not want them to take the baby. Loraine and the Sheriff, after unsuccessfully searching for the baby in Eolia, returned to Hannibal. Shortly thereafter, on November 13, 1944, petitioners instituted these proceedings.

The evidence further shows that during the period that Jo Ann stayed with petitioners, respondent contributed nothing toward her support. During that time petitioners clothed and fed the child, and took care of all of her wants. They sent her to Sunday school, kept

her neat and clean, and treated her with love and affection, as though she were their own child.

The evidence further shows that Gus Watson is 47 years of age, and owns his own home. He is employed as a truck driver, earning $27 per week. Mrs. Watson is employed in a glove factory, and employs a girl to look after the child when she is at work.

Several prominent people of Clarksville testified that the Watsons were hard-working, honest, law-abiding citizens; that their house was well kept, and that the little girl was well-dressed, neat, and clean.

Loraine lives with the Andersons, who live in a five-room frame dwelling in one of the better negro sections of Hannibal. Mrs. Anderson's sister married Loraine's father. Mr. Anderson is 24 years old, employed, and earns $30 per week. Mrs. Anderson is 29 years of age, employed in the shoe factory, working on the day shift, and earns $26 per week. Loraine works from $5:00 P. M. to 2 A. M. During the day she looks after the children, while at night Mrs. Anderson looks after them. Mrs. Anderson has three small children.

Loraine sent Jo Ann to Sunday School each Sunday while she stayed with her during the summer of 1944. She testified that she intended to continue that practice if she regains custody of the child. She bought two pairs of shoes, four or five dresses, underclothes, socks, ribbons, and other things for the child during this period. She also bought milk for her during that whole time.

Mrs. Alls, a neighbor of the Andersons, testified that Loraine bore a good reputation in the community, and that she had never known of her running around with men. She also stated that the Andersons bore a good reputation.

Davis Benning, Esq., an attorney at Louisiana, Missouri, was appointed guardian *ad litem* for Jo Ann Watson, and was instructed by the court to make an investigation of the homes of petitioners and of the mother, and any other investigation that he might deem advisable, and to report his findings to the court, together with his opinion as to the adoption prayed. His report filed in the case was as follows:

That on the 15th day of June, 1945, he went to Clarksville, Missouri, the home of Petitioners and made an investigation of the home and the general reputation of Petitioners in that community.

He found the home of Petitioners to be a two room house consisting of a kitchen and bed room, located in one of the Negro sections of Clarksville. The home was comfortably furnished and was neat and clean. At the time of the visit, Petitioner, Georgianna Watson was present in the home as was the infant child JoAnn Watson. JoAnn was neatly dressed and was clean and apparently happy and contented. The Petitioner, Georgianna Watson was

neatly dressed and the general surroundings were favorable for the rearing of a child the age of JoAnn Watson.

"After visiting the home of Petitioners, your Guardian talked with five or six business and professional men of Clarksville and found that both petitioners, Gus Watson and Georgianna Watson had good reputations in that community and further found that they were generally looked on as having taken good care of JoAnn during the time she had been with them.

"On July 8th, 1945, your Guardian went to Hannibal, Missouri, and investigated the home conditions of the mother, Loraine Watson. July 8th was on Sunday and the Mother was found at home. Loraine Watson lives with a Mr. and Mrs. Anderson, who have three children of their own. The home is a three room frame dwelling in one of the better Negro sections of Hannibal and consists of two bed rooms and a kitchen. The house is well furnished and is very neat and clean. Loraine Watson, the mother was neatly dressed and apparently is an intelligent woman and with some education. She informed your Guardian that she was working in the Shoe Factory at Hannibal, where she had been steadily employed for the past year and that her earnings were $29.50 a week, and that she has no reason to believe that she will not be steadily employed. She informed your Guardian that she worked at night and that Mrs. Anderson with whom she lived worked during the day time and during the time she had her daughter JoAnn on previous occasions, she took care of the child during the day time while she was home and that Mrs. Anderson looked after the child during the night time while the mother was at work. Your Guardian talked with a neighbor of Loraine Watson, who was visiting her at the time the investigation was made and she verified the statements of Loraine Watson as to her work, her earnings and how the child was taken care of during the time she had been with her mother in the past. She also stated that Loraine Watson enjoyed a good reputation in the Neighborhood.

"Your Guardian did not hear the testimony at the trial of the cause and is not familiar with the merits of the case, but from his investigation believes that as far as the general surroundings are concerned, the general reputation of the mother and the petitioners and the moral environment which would surround the child that either home would be a suitable place in which to rear the child. Your Guardian is of the opinion from his investigation, that the mother, Loraine Watson, desires to keep her child and to rear her and, is capable and willing to give her said child the best home within her means and to rear her in proper surroundings and can do so as well as the petitioners herein."

Mr. Benning testified in the case. He stated that when he made the investigation of the mother, he only talked to a colored lady who

was visiting the mother at the time he was in Hannibal. This lady stated that Loraine spent most of her time in the house during the day.

He further testified that both of the petitioners enjoyed good reputations; that he had talked to a witness who testified in court, who stated that Mrs. Watson kept the child neat and clean. He also found the Anderson home neat and clean. He stated that he had made no investigation of the general reputation of the mother in Louisiana. His instructions were to investigate the home. He was not aware of the fact that the mother had these two illegitimate children until after his report was filed. The following testimony then appears:

"Q. Would you care to make any further investigation, or give any other opinion? A. Not right now, if the Court would want me to give an opinion since I heard the testimony I would like to have a little further time to investigate. I don't believe from what I heard on the witness stand that I would want to give an opinion. The testimony is not recent enough to influence me. I would like to check her personal morality in Hannibal. It is a little difficult to do because of transportation, but I did make a thorough investigation of the home in Pike County. I did see the home and talk to the neighbors but that was all I had time to do, and I didn't have the means to get back up there to make any further investigation. It might be the testimony this afternoon would justify further examination.

"Q. The neighbor you talked to was acquainted with Loraine? A. She knew her for some time.

"Q. Since she had the child? A. Since the past year.

"Q. And she told you her reputation was good? A. Her reputation was good, and she was steadily employed, and the neighbor explained, as well as the mother, the arrangements for taking care of the child that they had used before on the working hours, but I only talked to the one witness in Hannibal, that is all I could find that afternoon that knew the mother. However, if the court would like for me to investigate in Hannibal further and report back, I would make an effort to do so."

Appellants brought out testimony calculated to warrant an inference of improper relations between Loraine and Anderson. Gus Watson testified that about five years previously Loraine stayed at the Watson home for two or three weeks, and that while there Anderson came to see her two or three times. He further testified that at the time he told Anderson to stay away; that he was not going to have him running back and forth to see her because he was a married man. On cross-examination he testified that he had an idea what Anderson came for; that he observed nothing out of the way; that Anderson acted a perfect gentleman; that he did not know of

Loraine going out with Anderson, and that he knew of no misconduct while she was living at the Anderson home.

Mrs. Watson also testified that when Loraine was staying at the Watson home at the time in question, Loraine received visits from Anderson, and in addition received letters from him. She stated she did not know what the letters contained.

Loraine took the stand and denied these accusations of the Watsons.

Thereupon the trial court adjourned the hearing, and instructed Mr. Benning to investigate these charges. At that time the attorney for petitioners announced in open court:

"MR. WILKINS: If there is any question about Anderson visiting this woman I will produce in this Court half a dozen reputable people that saw him. I will make that bold statement to the Court."

Mr. Benning made an investigation, and thereafter testified as follows:

"I found nothing to substantiate that allegation. I talked with Mr. Wilkins and asked him to talk to his clients and if he had anybody for me to talk with, and Mr. Wilkins called back and said they didn't have the names of the neighbors who knew about it. I talked with the relation of the mother in Louisiana and checked with them and they never heard of Anderson or of any association of hers with him, and I could find nothing to substantiate an allegation she had associated with him."

He further testified that he talked to Martha Lucas, her sister, and her brother Joe, who were good colored people who reared Loraine until she left home, and they said they had never heard of Anderson and had never heard of Loraine associating with a man by the name of Anderson.

Mr. Benning further testified that he had no objection to the adoption of Jo Ann by the Watsons; that his investigation showed that they bore good reputations; and, he found nothing in his investigation that was detrimental to the general reputation of Loraine, except the testimony previously presented on the witness stand; that he found nothing derogatory with reference to her reputation during the last year, or anything which would change the views formed from his first investigation.

Mrs. Anderson testified that since Loraine had been living at the Anderson home, she had never seen anything out of the way between Loraine and witness' husband; that there had been no conduct on the part of either Loraine or her husband which would lead her to believe there was anything between them; that Loraine's conduct was good; that she worked steady, and that it was perfectly agreeable to her to have Loraine and the child in their home.

Petitioners produced no further witnesses to corroborate the charge of improper relations between Loraine and Anderson.

Clifford Martin, a police officer of Louisiana, Missouri, testified that Loraine's reputation for morality was bad. On cross-examination he stated that he based his opinion upon the facts that she had given birth to an illegitimate child, and upon a conversation he overheard between a schoolteacher and Guy Rudd and others one evening. The schoolteacher said he had been having trouble with her, and the other people stated that she was disgracing the Lucas and the Bells, with whom she lived, by running around. Apparently this conversation had occurred more than five years previous to the trial, since the evidence shows that Loraine left the home of the Lucas about the time her first child was born.

Upon the foregoing evidence, the Court found the issues against the petitioners, and ordered the child returned to her mother within ten days. From this judgment petitioners, after the Court overruled their motion for new trial, appealed.

Adoption of children is purely statutory in this State, having no common-law background, and the adoption statute should be strictly construed in favor of the rights of natural parents where there is an attempt to destroy the parental status. [In re Perkins, 234 Mo. App. 716, 117 S. W. (2d) 686; Thompson v. Arnold, 208 Mo. App. 102, 230 S. W. 322.]

The adoption statute, section 9609, Revised Statutes Misouri 1939 (Mo. R. S. A., sec. 9609), provides that the court should not decree an adoption unless the parents or surviving parent and guardian of the child, if any, consent in writing to the adoption, except where such parent "is insane, or is imprisoned under a sentence which will not expire until two years after the date of the filing of the petition; or if he or she has wilfully abandoned the child or neglected to provide proper care and maintenance for the two years last preceding such date."

In the case at bar respondent did not give her consent in writing to the adoption of her child by appellants, and the sole question presented is, whether the necessity of such consent was obviated by a wilful abandonment of the child by respondent, or by her neglect to provide proper care and maintenance for the two years last preceding the date of the filing of the petition.

The statute does not define the term "abandon," nor are there any decisions of this State to be found where a definition of it is given. Webster's New International Dictionary (2 Ed.), Unabridged, defines "abandon" as: "To relinquish or give up with the intent of never again resuming or claiming one's rights or interests in; to give up absolutely; to desert, as a person to whom one owes a duty, allegiance, or the like."

A wilful abandonment then would seem to imply, first, a voluntary and intentional relinquishment of the custody of the child to another, with the intent to never again claim the rights of a parent or per-

form the duties of a parent; or, second, an intentional withholding from the child, without just cause or excuse, by the parent, of his presence, his care, his love, his protection, maintenance, and the opportunity for the display of filial affection.

In our opinion petitioners have failed to show a wilful abandonment by Loraine Watson of her infant child. According to petitioners' evidence the mother requested them to take the child and to give it a home because she had reached a point where she could not support it. According to respondent's testimony, which was corroborated by Mrs. Anderson, Loraine asked Mrs. Watson to keep the child, not permanently, but for a little while. After a review of the whole evidence, we are convinced that Loraine Watson was telling the truth when she so testified. Her conduct, therefore, did not amount to an intentional relinquishment of the custody of the child to another, with the intent to never again claim the rights of a parent or perform the duties of a parent.

Does her conduct at the time she delivered the child to petitioners, and subsequent thereto, amount to an abandonment under the second section of our definition of a wilful abandonment? In our opinion it does not. Respondent was destitute and unable to provide for the child. Instead of deserting the child, she arranged for its temporary care. Therefore, she did not withhold her presence from the child, or fail to bestow upon it her love and care without just cause or excuse. She was prompted by the highest motives. She was securing its welfare, rather than abandoning it.

Was there neglect on the part of respondent to provide proper care and maintenance for the two years last preceding the date of the filing of the petition? Clearly not.

Respondent delivered her child to petitioners in September, 1942. In July, 1944, she regained custody, which thereafter was interrupted by the unlawful act of petitioners in seizing the child and carrying it off to their home in Clarksville. Thereafter respondent sought unsuccessfully to regain custody of her child. She consulted the prosecuting attorney, but he would do nothing for her. She secured the aid of the Sheriff of Pike County, but was unable to find the child. Two or three weeks later petitioners filed this suit. During the four or five weeks that respondent had the child in the summer of 1944, she fully performed her duties as a parent. Not only was there no showing of neglect to provide proper care and maintenance for the two years next preceding the date of filing of the petition for adoption, but there was no showing of any neglect at all. In In Re Perkins, 234 Mo. App. 716, 171 S. W. (2d) 686, this court has held that to make a case of neglect which will dispense with

consent of the parent in adoption cases, it must be shown that the neglect was intentional, deliberate, and without just cause or excuse.

The action of the trial court in denying a decree of adoption in this case was proper. The judgment is affirmed. *Hughes, P. J.,* and *McCullen, J.,* concur.