In the Interest of B.B.B., Plaintiff.

Geoffrey Edward ALLEN, Juvenile Officer, Respondent,

v.

E.L.S.—Natural Father, Appellant.

No. WD 49979.

Missouri Court of Appeals, Western District.

Aug. 29, 1995.

Robert M. Schieber, Kansas City, for appellant.

Lori Stipp, Kansas City, for Juvenile Officer.

Dale Godfrey, Kansas City, for guardian ad litem.

Before FENNER, C.J., and BRECKENRIDGE and SPINDEN, JJ.

BRECKENRIDGE, Judge.

E.L.S. (Father) appeals the termination of his parental rights to his son, B.B.B. Father contends there was insufficient evidence he abandoned his child, and therefore his parental rights should not be terminated.

The judgment is affirmed.

K.M.B. (Mother) and Father lived together for several months during which time Mother became pregnant. Father was aware of the pregnancy. However, prior to the child's birth, Mother and Father ended their relationship. Father testified that he believed Mother had an abortion or miscarried, and he did not know of B.B.B.'s existence until approximately one week after May 13, 1992, the date B.B.B. was born.

Upon the birth of B.B.B., Mother initiated proceedings for his adoption through the Missouri State Division of Family Services (the Division). A Division adoption specialist was assigned to the case on May 18, 1992. Mother did not reveal to the Division that E.L.S. was the father, but instead indicated that a different man was the father and that she was unaware of that man's whereabouts. Father did not have knowledge of Mother's arrangements for an adoption and did not consent to them.

On May 20, 1992, Father's sister called the Division adoption specialist and stated she believed her brother was B.B.B.'s father, as she had been informed of the child's birth by a third party. The adoption specialist then scheduled an appointment for Father and his sister on May 22, 1992. On May 21, 1992, the juvenile officer, Geoffrey Edward Allen, filed in the Circuit Court of Jackson County, Missouri, Juvenile Division, a petition alleging B.B.B. was without proper care, custody and support, and praying that the juvenile court take jurisdiction of B.B.B. The juvenile officer also filed a request for detention to allow the child to be placed in the Division's custody and into a foster home. An order of detention was entered on that same day.

The next day when Father attended the meeting at the Division, he was informed that the natural mother did not name him as the father and that the Division needed to have his paternity proven by means of a blood test before unification with the child could be discussed. Father stated that he believed the child was his and that he wanted

custody of B.B.B. so his sister could raise the child. Father further informed the Division he would arrange for paternity testing on his own. The adoption specialist discussed with Father the possibility of pursuing testing through the Division, but he declined.

After Father initially met with the adoption specialist on May 22, 1992, five months passed before he made another contact with the Division. During this interim, the adoption specialist sent seven letters to Father, including one by certified mail, requesting that he contact the Division. The letters dated June 8, July 10, July 17, August 10, August 17, August 25, and September 10, all of 1992, requested that Father contact the Division regarding his plans for pursuing paternity, stating contact was important because plans needed to be made for B.B.B. Father failed to respond to these letters.

Father was served with a summons dated July 2, 1992 regarding the juvenile court petition requesting that B.B.B. be adjudged to be without proper care, custody and support and placed under the court's jurisdiction. Father did not appear on any court dates in the juvenile proceeding, although he was represented by court-appointed counsel at the full hearing on the petition. Furthermore, the Division sent a notice to Father regarding its meeting on November 4, 1992 to review B.B.B.'s placement. Father did not attend this meeting.

Father finally contacted the Division in October of 1992, when he called the adoption specialist to inform her that he could not afford a paternity test. Upon receipt of Father's call, the adoption specialist asked a juvenile court commissioner if she should refer Father to Child Support Enforcement to request assistance in obtaining a paternity test. She was told not to make a referral. In November of 1992, however, she did undertake to make such a referral. Child Support Enforcement declined to provide paternity testing at that time. Father was not offered any services of the Division, such as visitation, because the issue of paternity was not resolved.

The hearing on the petition to determine whether B.B.B. should be under the jurisdiction of the juvenile court took place on December 3, 1992. As stated previously, Father did not appear, but was represented by his attorney. The court determined that the facts of the petition were true, that the child was without proper care, custody and support in that the mother had repeatedly asked to be relieved of the child's care and custody and asked that the child be placed for adoption. The court assumed jurisdiction of the child and ordered B.B.B. to remain in the Division's custody. The court further directed the Division to refer B.B.B.'s case for termination of parental rights.

Pursuant to the juvenile court's direction, the juvenile officer filed a petition for termination of parental rights on December 24, 1992. The petition alleged Father's parental rights should be terminated pursuant to § 211.447 because Father had abandoned the child for a period of sixty days or more.

On April 15, 1993, upon Father's request, the juvenile court ordered the Division of Child Support Enforcement to complete the blood testing. The results determined a 99.95 percent probability that B.B.B. is Father's son. The day of the blood test, May 20, 1993, is the only time Father has seen B.B.B.

The hearing on the petition for termination of parental rights occurred on May 12, 1994. On August 4, 1994, a judgment was entered which held that Father had abandoned B.B.B. by leaving the child without any provision for financial or parental support and without making arrangements to visit or communicate with the child although able to do so. The court further found that no additional services would likely bring about adjustment which would enable the child to be given to Father, and that Father had shown a lack of interest in and commitment to the child. Thus, the court found it was in the best interests of B.B.B. that the parental rights of Father be terminated and so ordered. Father filed this appeal.

In his sole point on appeal, Father claims that the juvenile officer did not prove by substantial evidence that he abandoned B.B.B. Therefore, he contends, the trial court erred in terminating his parental rights.

A court should terminate parental rights only when it is in the best interests of the child and is substantiated by clear, cogent, and convincing evidence of one of the statutory grounds for termination. *In Interest of R.L.N.*, 886 S.W.2d 15, 17 (Mo.App. 1994). Clear, cogent and convincing evidence is "evidence that instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *In Interest of N.D.*, 857 S.W.2d 835, 838 (Mo.App.1993) (quoting *In Interest of J.M.*, 815 S.W.2d 97, 101 (Mo. App.1991)). The evidence and all reasonable inferences therefrom are to be viewed in the light most favorable to the decision. *In Interest of M.L.K.*, 804 S.W.2d 398, 400 (Mo. App.1991). This court will give due deference to the trial court's determination of the credibility of witnesses, and the trial court's decision will be upheld, unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *In Interest of D.O.*, 806 S.W.2d 162, 166 (Mo.App.1991).

Section 211.447.2(1), RSMo 1994, provides that parental rights may be terminated if it can be shown that a parent has abandoned a child. Such abandonment will have occurred if the parent has left the child "for a period of six months or longer for a child over one year of age or a period of sixty days or longer for a child under one year of age at the time of the filing of the petition." Section 211.447.2(1). A showing of abandonment also requires the parent to have left the child without good cause and "without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so." § 211.447.2(1)(b).

An allegation of child abandonment is generally not compatible with a case in which custody of the child has been taken from the parent involuntarily. *In Interest of Baby Girl W.*, 728 S.W.2d 545, 549 (Mo.App.1987). The reason for this rule is that "the enforced separation of parent and child and placement of the child in a foster home operates to accomplish some estrangement and, without intervention by the juvenile officer to effect reconciliation, operates to create the very circumstances which destroy the parent-child relation." *Id.* This rule is also explained by the fact that "the opportunities for parental association and the incentives to provide monetary support are subtly discouraged when the Division has assumed custody." *In Interest of W.F.J.*, 648 S.W.2d 210, 215–16 (Mo.App.1983).

This rule does not necessarily apply in all cases. Sometimes, the evidence may demonstrate that a parent's lack of involvement may go beyond what is attributable to the estrangement and discouragement caused by the enforced separation, in which case the lack of involvement would indicate a settled purpose of willful abandonment. *See id.* at 215. Abandonment has further been defined as the willful giving up of the child while intending that the severance be of a permanent nature. *In re Interest of T.H.*, 497 S.W.2d 210 (Mo.App.1973).

In the case at bar, Mother arranged for the child to be adopted without Father's knowledge or consent, and the child was placed in the custody of the Division as a part of this process. The child's placement in custody of the Division may have hindered Father's ability to visit or communicate with his child. Nevertheless, this court has found clear, cogent and convincing evidence that Father meets the conditions for abandonment under § 211.447.2(1).

The Missouri Legislature has established that abandonment for sixty days is all that is necessary to terminate a parent's rights to a child who is under one year of age. § 211.447.2(1). B.B.B. was under one year of age on December 24, 1992, the date of the filing of the termination petition. The period of time Father abandoned B.B.B. well exceeded the sixty-day time frame, in that Father permitted nearly five months to pass with absolutely no contact with the Division. Following his discovery of B.B.B.'s birth, Father made the initial visit with the Division on May 22, 1992 and then made no contact until his phone call in October.

During this time, the adoption specialist made significant efforts to encourage Father to make contact with the Division through

seven letters and one notice of a Division meeting. The letters advised Father it was important that contact be made to discuss B.B.B.'s future. Yet, Father failed to respond to the letters or the notice. It is true the Division did not inform Father of his right to visitation, nor did it make an effort to effect a reconciliation of Father and the child. But it is also true that Father did not inquire about these services, and it was due to the lack of contact by Father that the Division had no opportunity to provide services to Father.

"Whether or not there has been an abandonment ... requires an examination of the parent's intent, an inferred fact, determined by considering all the evidence of the parent's conduct, including that before and after the statutory period." *In re Adoption of W.B.L.*, 681 S.W.2d 452, 455 (Mo. banc 1984) (citations omitted). Though Father stated that he wanted custody of the child and the only reason he was not able to claim custody by proving paternity was due to a lack of finances, his behavior indicated otherwise.

█ Furthermore, Father's behavior did not constitute a repentance of his abandonment of B.B.B. Although a parent may repent of an abandonment, not every gesture by that parent will terminate such abandonment. *In re Adoption of W.B.L.*, 681 S.W.2d at 455. Between the May 22, 1992 meeting with the Division and the December 24, 1992 filing of the petition for termination of parental rights, Father's only contact with the Division was one phone call. And, although his attorney was present, Father did not even appear at the December 3, 1992 hearing where the court assumed jurisdiction over the child. Father's conduct did not establish his repentance of the abandonment.

Though B.B.B. was taken involuntarily from Father, the evidence examined by this court reveals that Father's lack of involvement in the child goes beyond what may be attributed to the separation due to the child being in custody of the Division. Father did nothing to exercise his parental rights, fulfill his parental responsibilities or show any interest in B.B.B. for nearly five months. He did not respond to the Division's requests for contact. He did not inquire about the child's

well-being, nor request visitation with the child. Father also failed to offer any support, financial or otherwise to the child. A reasonable inference from the evidence is that Father willfully gave up the child and intended that the severance be permanent.

There is clear, cogent and convincing evidence supporting the juvenile court's finding that Father willfully abandoned B.B.B. The judgment is affirmed.

All concur.