In the Matter of E.F.B.D.

W.H. and K.H., Petitioners–Respondents,

v.

S.B., Respondent–Appellant.

No. 28324.

Missouri Court of Appeals, Southern District, Division One.

Feb. 25, 2008.

Douglas Andrew Hosmer, Springfield, MO, for Appellant.

Keith Parris, Monett, MO, for Respondent Lawrence County Juvenile Office.

Amy Lynn Boxx, Monett, MO, for Respondents Holland.

Scott Roberts Pettit, Aurora, MO, for Juvenile/Minor.

Roger Walker Owensby, Springfield, MO, for Respondent Division of Family Services.

JEFFREY W. BATES, Judge.

S.B. (Father) appeals from a judgment terminating his parental rights to E.F.B.D.[1] Father's parental rights were terminated on the ground of abandonment pursuant to § 211.447.4(1)(b).[2] On appeal, Father contends there was insufficient evidence to prove this statutory ground for termination. Alternatively, he contends there was sufficient evidence to show that he repented of his abandonment of E.F.B.D. This Court affirms.

■ To terminate parental rights, a trial court must use a two-step analysis. *In re S.J.H.*, 124 S.W.3d 63, 66 (Mo.App. 2004). In the first step, the court must find by clear, cogent and convincing evidence that one or more statutory grounds for termination exist. § 211.447.5; *In re P.L.O.*, 131 S.W.3d 782, 788 (Mo. banc 2004). "Clear, cogent, and convincing evidence is evidence that instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *In re S.M.H.*, 160 S.W.3d 355, 362 (Mo. banc 2005). This standard of proof may be satisfied even though the court has contrary evidence before it or the evidence might support a different conclusion. *In re Adoption of W.B.L.*, 681 S.W.2d 452, 454 (Mo. banc 1984); *In re A.K.F.*, 164 S.W.3d 149, 151 (Mo.App.2005). After finding one or more statutory grounds for termination have been proven, the trial court then moves to the second step and must determine, by a preponderance of the evidence, whether the termination of parental rights is in the child's best interest. § 211.447.5; *P.L.O.*, 131 S.W.3d at 789; *S.J.H.*, 124 S.W.3d at 66.

■ On appeal, we review a trial court's decision that one or more statutory grounds for termination exist to determine whether the ruling is supported by substantial evidence, is against the weight of the evidence, or involves an erroneous application or declaration of the law. *S.M.H.*, 160 S.W.3d at 362. We will not reverse the trial court's decision unless we are left with the firm belief that the decision was wrong. *Id.* We defer to the trial court's assessment of witness credibility. *In re C.F.C.*, 156 S.W.3d 422, 426 (Mo.App. 2005). "[T]he appellate court defers to the trial court on factual issues because it is in a better position not only to judge the credibility of witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record." *W.B.L.*, 681 S.W.2d at 455. We also bear in mind that the trial court was free to believe all, part or none of a particular witness' testimony. *In re L.R.S.*, 213 S.W.3d 161, 164 (Mo.App.2007). The facts and the reasonable inferences derived therefrom are considered in the light most favorable to the judgment. *In re L.N.D.*, 219 S.W.3d 820, 822 (Mo.App.2007); *In re*

---

1. The parental rights of E.F.B.D.'s mother have already been terminated and are not at issue in this appeal.

2. All references to statutes are to RSMo (2000).

*L.M.*, 212 S.W.3d 177, 180 (Mo.App.2007). Thus, conflicting evidence will be reviewed in the light most favorable to the trial court's decision. *In re A.S.W.*, 137 S.W.3d 448, 452–53 (Mo. banc 2004). Viewed in that fashion, the following evidence was adduced at trial.

E.F.B.D. was born on June 18, 1993. Her biological parents are P.C. (Mother) and Father. The couple was not married and lived apart. E.F.B.D. resided with Mother and spent every other weekend with Father until August 1994, when she was 14 months old. At that point, Father failed to return E.F.B.D. after a routine visit. A deputy sheriff and a DFS caseworker came to Father's house and ordered him to turn E.F.B.D. over to Mother. After this incident, Mother left the area with E.F.B.D. Mother kept in touch with Father's half-brother, who kept Father informed of where Mother and E.F.B.D. were living.

In 1996, Mother and the Division of Child Support Enforcement (DCSE) filed a petition in the Circuit Court of Greene County, Missouri. The petition sought to change E.F.B.D.'s last name to that of Mother's late husband, establish Father's paternity and establish a child support order. Father was served with the petition, but he did not appear at the hearing. Between May and October 1997, Mother received child support payments of approximately $117 per month from Father. DCSE knew Mother's address and was sending Father's support payments to her. Between October 1997 and March 2001, Father provided no monetary support for E.F.B.D.

In March 2001, the Lawrence County juvenile officer filed a petition requesting that E.F.B.D., then nearly 8 years old, be placed in protective custody and that temporary legal and physical custody of her be placed with DFS due to a history of child abuse and neglect reports involving the child and her siblings.[3] The court entered an order granting the relief requested in the petition and appointed a Guardian Ad Litem (GAL) for E.F.B.D. Father's name and address for notice purposes appeared on the petition and investigation report. When the court held a hearing a week later to determine temporary custody, a docket entry noted that "[Father of E.F.B.D.] fails to appear."

In April 2001, DFS placed temporary physical custody of E.F.B.D. and her younger half-sister, L.D., with foster parents W.H. and K.H.[4] That same month, Father contacted E.F.B.D.'s caseworker, Brandi Parris (Parris). On April 30, 2001, Parris met with Father and his mother (Grandmother), who both requested that custody of E.F.B.D. be placed with either of them. Parris specifically informed Father that to obtain custody, he would have to complete a Written Service Agreement (WSA) and provide child support to E.F.B.D. Father said that he would do so.

After the meeting, Parris ran a "Child/ Abuse and Neglect screening" to determine if either party had any involvement with DFS. She found that Cass County then had an open investigation regarding Father, his fiancée, and her daughter. The daughter had alleged that Father sexually fondled her. A no-contact order had been issued, so Father was living with Grandmother at the time. Because the

---

3. At that time, the Division of Family Services was commonly known as DFS. This agency is now known as the Children's Division. To avoid confusion, however, we will refer to the agency as DFS throughout this opinion.

4. W.H. and K.H. have already adopted L.D., whose natural father consented to the termination of his parental rights.

investigation was pending, Father was not considered as an immediate placement for E.F.B.D. A favorable outcome to the investigation, however, would permit Father to be considered a possible long-term placement for E.F.B.D. The next day, Parris submitted home study requests for both Father's home and Grandmother's home in Jackson County, where they resided.

On May 31, 2001, Father attended the next scheduled family support meeting. Thereafter, Father did not call to check on E.F.B.D.'s welfare or send anything for her support.

In June 2001, Parris received two letters from a Jackson County caseworker who was responsible for conducting the home studies of Father and Grandmother. The first letter stated that Father's home study case had been closed because the caseworker made two attempts to contact Father, and he failed to respond. The second letter stated that Grandmother's home study had been closed at her request because she was not sure whether E.F.B.D. was really her granddaughter.

In September 2001, Parris sent Father a proposed WSA. He was asked to review, sign and return the document to Parris. Father had to return the document in order for it to be submitted to the court for approval. The WSA included counseling services so Father could meet E.F.B.D. at a session and permit a counselor to determine whether visitation was appropriate. The proposed WSA was not returned to Parris before she left her caseworker position at the end of October 2001.

In November 2001, a second DFS employee took over E.F.B.D.'s case. In a midmonth report, the caseworker noted that Father had made no effort to contact DFS to check on E.F.B.D.

On December 19, 2001, Father returned the signed WSA to DFS. The agreement required Father to: (1) participate in a substance abuse evaluation; (2) support E.F.B.D. on a regular basis by cooperating with child support enforcement; (3) visit E.F.B.D. once the judge had ruled that it was in her best interest after the counselor's recommendation; (4) notify DFS of any moves and be available for a worker to make home visits; (5) maintain contact with DFS at least two times a month, notify DFS of any changes in residences or life circumstances and obtain information as to how E.F.B.D. was doing; (6) attend parenting classes; (7) participate in family counseling with E.F.B.D. and follow all recommendations made by that counselor; (8) abstain from alcohol and drugs and those associating with the same; (9) work with Cass County DFS regarding the open case involving sexual abuse; and (10) participate in a psychological evaluation with a licensed psychologist.

Thereafter, Father underwent a psychological evaluation by Dr. Gregory Sisk (Sisk) in February 2002. In Dr. Sisk's report, he did not recommend that E.F.B.D. be placed with Father at that time because his family "needed a lot of healing" in dealing with the sexual allegations against him. Sisk indicated that it might take considerable time to incorporate E.F.B.D. into Father's home.

On February 28, 2002, Father met individually with E.F.B.D.'s counselor, Dr. Amy Meriweather (Meriweather) to prepare him to meet E.F.B.D. Meriweather explained to Father not to touch or hug E.F.B.D., who was exposed at a young age to inappropriate sexual behavior by her stepfather. On March 18, 2002, Father and E.F.B.D., then almost 9 years old, met for the first time since her infancy. Meriweather described their first meeting as "neutral" for E.F.B.D. After the second visit, Meriweather described them as "negative." Meriweather suspended visitation

after Father's third visit. At the end of the visit, E.F.B.D. reported that she was very uncomfortable with the way Father massaged her hand. According to Meriweather, it was clearly overwhelming to E.F.B.D. and made her distrustful and afraid of Father. After Father's third visit, E.F.B.D. regressed in therapy and adamantly stated she did not want to be with her father. Meriweather believed Father had showed insensitivity towards E.F.B.D. and was more concerned with his own needs. Meriweather also opined that Father was insincere in his efforts to locate E.F.B.D. prior to her coming into DFS custody.[5] Meriweather did not recommend E.F.B.D.'s placement with Father and also warned that separation from her sister, L.D., would be damaging to E.F.B.D.

In July 2002, another home study of Father's home was finally completed. Father's home was found to be an unfavorable placement for E.F.B.D. According to the evaluation, Father's current family situation was simply too volatile to consider placing another female child in his home at that time. The caseworker also noted that E.F.B.D. and her sister were bonded, they should continue to reside together, and it would not be in their best interest to separate them. The caseworker recommended that: (1) E.F.B.D. not be placed in Father's care; and (2) Father further participate in services to evaluate his parenting skills, attachment to E.F.B.D., ability to meet her needs and stability of his current family life.

On August 2, 2002, W.H. and K.H. filed a petition seeking to terminate the paren-

tal rights of Mother and Father and to adopt E.F.B.D. and L.D.[6] In pertinent part, the petition alleged that parental rights be terminated because:

> The parents have abandoned the children for a period of at least six months and have failed to provide any support for the minor children for at least that length of time. Although [Father] has begun paying the child support more recently, he is presently approximately $17,000.00 in arrears on his child support obligation. Further, the said [Father], has been absent from the child's life for some eight years prior to her coming into the custody of the Division of Family Services.

Trial on the petition began in June 2003 when the petitioners presented their evidence. Caseworker Sarah Wilson (Wilson), who worked with Father on his WSA, testified that only half of the requirements were completed. Wilson confirmed that Father was paying child support, but it was pursuant to a garnishment rather than a voluntary payment. Father had failed to provide proof that he underwent a substance abuse evaluation or attended parenting classes. There also were problems with Father's visitation, which was terminated after the third visit, and with his home study. The GAL recommended termination of Father's parental rights as well. The trial was completed in September 2003 after Father presented his evidence. Father admitted that he owed an extensive amount of back child support. His wages were being garnished to pay the

---

5. Based on Meriweather's conversations with Father, she explained that "he's clearly an individual who knows how to motivate systems around him, and yet he's saying that he couldn't even pay child support on her, which is probably the most accessible thing our— our county governments have, is for child

support to be paid. And so I—I wondered about the sincerity of his effort to find her prior to being involved with me."

6. The Lawrence County juvenile officer and DFS were joined as parties to the proceeding.

arrearage, and he was not paying any current support.[7]

In October 2003, the trial court terminated Father's parental rights on the ground that Father had neglected E.F.B.D., which had not been alleged as a ground for termination in the petition. On appeal, the judgment was reversed. *In re E.F.B.D.*, 138 S.W.3d 145, 151 (Mo.App. 2004).[8]

In December 2006, the trial court held another hearing on the termination petition. Following the initial termination of parental rights in 2003, DFS discontinued further services to Father. Between October 2003 and December 2006, Father made no contact with DFS concerning E.F.B.D. During that same time frame, Father did not write, call or provide any in-kind support to E.F.B.D. The last time Father had paid current monetary child support for E.F.B.D. was in March 2003.

On January 26, 2007, the trial court entered its Amended Judgment and Order terminating Father's parental rights on the statutory ground of abandonment. The court found E.F.B.D. had been abandoned because:

> The father has repeatedly and continuously failed to provide the child with adequate support, although physically and financially able to do so and was over $17,000.00 in arrears in his child support obligation at the time of the original trial of this matter. The father has not for a period of years and continues to fail to provide any current support for the child, although able to do so. At the time of the last hearing on this

matter, the father testified that he was paying a monthly amount towards arrearage only. [Mother] testified that, although her parental rights were terminated by this Court some three years ago, she is receiving child support from the father for the arrears owed. The records of child support payments were introduced into evidence and show that the only payments beings [sic] made by the father are for the arrearages owed to [Mother] and the father is not paying any current child support for the benefit of E.F.B.D. The father has failed to visit with the child from infancy until after the child came into the custody of the Missouri Children's Division; making mere token efforts to locate her in the interim. [Mother] testified at the original hearing that [Father] would have been aware of the child's whereabouts or could have easily determined the child's whereabouts, if he had desired to do so, as she was receiving child support payments from him from May of 1997 to October of 1997, although [Father] testified he had not known of any child support order until 2002. The Court finds the testimony of the father not credible.

This appeal followed.

*Point I—Abandonment*

In Father's first point, he contends the evidence was insufficient to prove the statutory ground of abandonment pursuant to § 211.447.4(1)(b). In relevant part, this subsection states that "[t]he court shall find that the child has

---

7. Father began paying child support arrearages to Mother in October 2001 and continued to do so through the date of trial in December 2006. None of these payments were used to provide current support for E.F.B.D., and Father made no additional payments for that purpose.

8. After the first appeal, the trial court entered an amended judgment substituting abandonment as the statutory ground for termination. Because judgment was entered before the mandate issued, however, the trial court lacked jurisdiction to act. *In re E.F.B.D.*, 166 S.W.3d 143, 146 (Mo.App.2005).

been abandoned if, for a period of six months or longer ... (b) The parent has, without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so[.]" *Id.; see In re J.M.S.,* 83 S.W.3d 76, 82 (Mo.App.2002). Abandonment has been defined as either "a voluntary and intentional relinquishment of the custody of the child to another, with the intent to never again claim the rights of a parent or perform the duties of a parent; or ... an intentional withholding from the child, without just cause or excuse, by the parent, of his presence, his care, his love, and his protection, maintenance, and the opportunity for the display of filial affection." *In re Watson's Adoption,* 238 Mo. App. 1104, 195 S.W.2d 331, 336 (1946); *see In re P.G.M.,* 149 S.W.3d 507, 514 (Mo. App.2004). This largely presents an issue of intent, which is inferred from the parent's conduct. *In re P.L.O.,* 131 S.W.3d 782, 789 (Mo. banc 2004); *P.G.M.,* 149 S.W.3d at 514. Evidence of the parent's conduct both before and after the requisite six-month period may be considered. *In re J.B.D.,* 151 S.W.3d 885, 888 (Mo.App. 2004). However, "[o]nly the parent's conduct prior to the filing of the petition for termination may be considered to establish the six-month period." *Id.*

 Father first argues the evidence is insufficient to prove that he had the ability to provide support to E.F.B.D. We disagree. Because the petition to terminate Father's parental rights was filed in August 2002, the focus is on Father's ability to provide support prior to that time. *See J.M.S.,* 83 S.W.3d at 82. Based on our review of the record, there was ample evidence before the trial court to conclude that Father did have that ability. For example, Father testified that he had obtained employer-provided health insurance for his dependents from shortly after E.F.B.D.'s birth.[9] The insurance plan changed when Father changed employers. Mother testified that she received $117 per month in child support arrearage payments from Father between May and October 1997, which proves an ability to pay support. Although Father testified he did not recall making child support payments in 1997, the trial court did not believe his testimony. This Court defers to the trial court's assessment of witness credibility. *In re Adoption of W.B.L.,* 681 S.W.2d 452, 455 (Mo. banc 1984). In October 2001, Mother once again began receiving back child support payments from Father pursuant to a wage withholding. At the December 2006 hearing, Father testified that he had been working for his present employer about five years. We also note that, in Father's December 2001 WSA, he agreed to provide financial support for E.F.B.D. and told that caseworker that he would have no problem doing so. Based on this evidence, the trial court could reasonably infer that Father was capable of employment and had the ability to provide financial support for E.F.B.D., but failed to do so. In any event, even if Father was not continuously employed during the relevant time period, "[e]vidence that a parent was capable of employment, although unemployed, is a sufficient basis for a trial court to determine that the parent was able to provide financial support for the child." *In re Q.M.B.,* 85 S.W.3d 654, 660 (Mo.App.2002); *In re A.H.,* 9 S.W.3d 56, 60 (Mo.App.2000).

9. Father obtained family coverage through his employer, which covered all of his children for one sum. Thus, E.F.B.D. was included in that coverage at no additional charge to Father. He included E.F.B.D. "in the event that she'd get back home sometime." However, Father never provided E.F.B.D.'s insurance card to anyone who had custody of E.F.B.D. so the insurance could be used to provide health care for her.

Father next argues that the evidence is insufficient to prove that he knew of E.F.B.D.'s whereabouts such that he could visit or communicate with her. Once again, we disagree. It is undisputed that Father had no contact whatsoever with E.F.B.D. between August 1994 and March 2001 when she was taken into protective custody. Mother testified that she kept in touch with Father's half-brother, who kept Father informed of where Mother and E.F.B.D. were living. While Father claimed that Mother and E.F.B.D. had "disappeared," the trial court did not believe that testimony. The court also found that Father made "mere token efforts" to locate E.F.B.D. This finding is supported by the evidence. In 1996, Mother and DCSE filed the Greene County action to establish Father's paternity and obtain child support. At that point, DCSE obviously knew of Mother's whereabouts. Father was served with process in that action. In 1997, he began making child support payments to Mother through DCSE. All of this stands in stark contrast to Father's testimony that: (1) he received no assistance from DCSE when he contacted that agency in 1996 in an effort to locate E.F.B.D.; (2) he did not recall paying any child support in 1997; and (3) he gave up looking for E.F.B.D. The court did not believe Father's testimony, and we defer to that assessment of his credibility. *W.B.L.*, 681 S.W.2d at 455; *In re C. F.C.*, 156 S.W.3d 422, 426 (Mo.App.2005).

In sum, the trial court was presented with substantial evidence proving that Father had the ability to provide support and visit or communicate with E.F.B.D., but he failed to do so. *W.B.L.*, 681 S.W.2d at 455–56. Point I is denied.

### *Point II—Repentance*

In Father's second point, he contends the trial court erred in terminating his parental rights because he repented of his abandonment of E.F.B.D. An abandonment can be repented "only by the actual or attempted exercise of parental rights and duties following the abandonment." *In re J.W.*, 11 S.W.3d 699, 705 (Mo.App. 1999). As our Supreme Court noted in *In re Adoption of W.B.L.*, 681 S.W.2d 452 (Mo. banc 1984):

> [N]ot every gesture by a natural parent will terminate such abandonment. Whether or not there has been an abandonment—or repentence of abandonment—requires an examination of the parent's intent, an inferred fact, determined by considering all the evidence of the parent's conduct, including that before and after the statutory period.

*Id.* at 455 (citations omitted). Father argues that he repented of his abandonment because, once he learned E.F.B.D. was in DFS custody, he began paying child support and fully cooperated with DFS just like the father in *In re A.R.*, 52 S.W.3d 625 (Mo.App.2001). For the following reasons, we disagree.

In *A.R.*, the western district of this Court held that A.R.'s father did not abandon his daughter after her placement in foster care because the father had only been out of contact with her for three months. *Id.* at 634–35. That is certainly not true in the case at bar. Additionally, the western district held that A.R.'s father repented of any abandonment because:

> After discovering that A.R. was in DFS custody, Father contacted DFS and expressed his interest in obtaining custody of her. He quit his job in Mississippi and temporarily relocated to Kansas City in an effort to obtain custody. He participated in therapy sessions and visitation with A.R. over the next seven months, seeing her at least twelve times. He bought her food, clothing and gifts. He attended individual therapy sessions,

court hearings, and the only family team support meeting for which he was provided notice. All of these activities occurred prior to the filing of the petition to terminate his parental rights. These efforts by Father constitute a reasonable effort on his part to assume parental responsibility for A.R. and establish his intent to repent any prior abandonment.

*Id.* at 636. There was no comparable conduct by Father in the case at bar. It is undisputed that Father had no contact with E.F.B.D. for over six and one-half years before she came into DFS custody in March 2001. Thereafter, Father was neither diligent nor fully cooperative with DFS in seeking to regain custody of E.F.B.D. Father did not appear at the temporary custody hearing. The sexual abuse allegations against him precluded short-term placement of E.F.B.D. with him. In June 2001, Father failed to respond to caseworker requests to schedule a home study. He did not contact DFS to check on E.F.B.D. during the summer months. In September 2001, Father failed to return the proposed WSA sent by E.F.B.D.'s first caseworker. In November 2001, E.F.B.D.'s caseworker noted that Father had made no effort to contact DFS to check on E.F.B.D. The signed WSA was not returned to DFS until late December 2001. At that point, E.F.B.D. had been in DFS custody nearly nine months. Father's inactions during this time period alone distinguishes the instant case from the actions of A.R.'s father.

*See A.R.*, 52 S.W.3d at 634 (since coming into foster care, A.R.'s father had only been out of contact with her for three months). In February 2002, Sisk recommended that E.F.B.D. not be placed in Father's home for a considerable time because of the issues created by the sexual abuse allegations against him. In the Spring of 2002, Father's failure to follow instructions during visitation with E.F.B.D. led to the suspension of those visits. In July 2002, Father received a negative home study evaluation. He only completed about half of his WSA requirements. In determining the issue of Father's intent, the trial court could have considered all of this evidence and concluded that there had been no repentance of E.F.B.D.'s abandonment.[10] *See, e.g., In re C.M.D.*, 18 S.W.3d 556, 563 (Mo.App. 2000) (no repentance shown because mother's contributions and communications during the two years prior to filing of petition were infrequent, and her conduct after the filing was properly given little weight); *In re Adoption of H.M.C.*, 11 S.W.3d 81, 88 (Mo.App.2000) (no repentance shown because there was no mother-child contact at all for four years, and mother made only minimal efforts thereafter); *In Interest of B.B.B.*, 905 S.W.2d 118, 122 (Mo.App.1995) (no repentance shown because, after the child was taken into DFS custody, the father did not appear at the jurisdictional hearing, made only one phone call to inquire about the child in five months and failed to support

**10.** Father also argues that repentance was demonstrated by his conduct subsequent to the filing of the petition to terminate his parental rights. It is well-settled, however, that a parent's post-filing conduct is often given little weight in determining repentance. *See, e.g., In re J.W.*, 11 S.W.3d 699, 706 (Mo.App. 1999) ("evidence of short-term improvements in a parent's circumstances which occur after the filing of the termination petition is not

necessarily compelling and that a parent's post-filing conduct cannot be the sole factor in the court's determination of repentance"); *In re C.M.D.*, 18 S.W.3d 556, 563 (Mo.App. 2000) (conduct after petition filed given little weight); *In Interest of M.L.K.*, 804 S.W.2d 398, 403 (Mo.App.1991) (court may determine parent's efforts after termination petition were token despite the fact that contrary evidence exists).

the child financially or otherwise); *In Interest of Y.M.H.*, 817 S.W.2d 279, 286 (Mo. App.1991) (no repentance shown because, after the court assumed jurisdiction, mother only spent approximately ten hours with her daughter and provided little support during a ten-month period).[11] Point II is denied.

### Point III—Past Conduct

■ In Father's third point, he contends the trial court erred in terminating his parental rights because the court did not base its decision on Father's conduct at the time of the termination hearing. This Court disagrees.

■ As Father correctly notes, a decision to terminate parental rights cannot be based on past conduct alone:

> An essential part of any determination whether to terminate parental rights is whether, considered at the time of the termination and looking to the future, the child would be harmed by a continued relationship with the parent. A prospective analysis is required to determine whether grounds exist and what is in the best interests of the child for the reasonably foreseeable future. Obviously, it is difficult to predict the future. Section 211.447 provides for detailed consideration of the parent's past conduct as well as the parent's conduct following the trial court's assumption of jurisdiction as good evidence of future behavior.

*In re K.A.W.*, 133 S.W.3d 1, 9 (Mo. banc 2004). Thus, the court must look to the totality of a parent's conduct before and after the filing of a termination petition, and a parent's past patterns provide vital clues about present and future conduct.

*In re Adoption of B.D.W.*, 185 S.W.3d 727, 739 (Mo.App.2006).

■ Here, the statutory ground for termination was abandonment. Abandonment can be proven by showing that, without just cause or excuse, a parent has intentionally withheld his presence, care, love, protection, maintenance and the opportunity for display of filial affection from the child. *See R.P.C. v. Wright County Juvenile Office*, 220 S.W.3d 390, 392 (Mo. App.2007). Termination for abandonment is warranted because such behavior is incompatible with a continuing parent-child relationship. As we already noted in our discussion of Father's second point, it is undisputed that he had no contact with E.F.B.D. for over six and one-half years before she came into DFS custody in March 2001. Thereafter, he continued to display a lack of genuine interest in E.F.B.D. by: (1) failing to contact her or inquire of DFS about her well-being; and (2) not diligently and fully cooperating with DFS in seeking to regain her custody. The court also held another hearing in December 2006 to hear additional evidence relevant to the termination petition. At this hearing, there was testimony that: (1) between October 2003 and December 2006, Father made no contact with DFS concerning E.F.B.D.; and (2) during that same time frame, Father did not write, call or provide any in-kind support to E.F.B.D. Thus, Father's past conduct continued unabated throughout the termination proceeding. This past and present conduct evinced an intent by Father to abandon E.F.B.D. and demonstrates that she would be harmed by a continued relationship with Father. *See K.A.W.*, 133 S.W.3d at 9. In sum, the record does not support Father's contention that his parental rights

11. The fact that Father contested the termination of his parental rights is not sufficient, in and of itself, to prove a repentance of his prior abandonment of E.F.B.D. *See In Interest of R.E.M.*, 712 S.W.2d 398, 401–02 (Mo. App.1986).

were terminated based upon his past conduct alone. Point III is denied.

The judgment of the trial court is affirmed.

PARRISH, P.J., and SCOTT, J., concur.