**In the Interest of Z.H. and Juvenile Officer, Respondents,**

v.

**G.H. (Natural Father), Appellant.**

**No. WD 56238.**

Missouri Court of Appeals,
Western District.

Sept. 14, 1999.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Nov. 2, 1999.

Application to Transfer Denied
Dec. 21, 1999.

**568**

Mark Lee Richardson, Jefferson City, for respondent.

Maureen M. Monaghan, Jefferson City, for Juvenile Officer.

Before Presiding Judge LAURA DENVIR STITH, Judge HAROLD L. LOWENSTEIN and Judge JAMES M. SMART, Jr.

LAURA DENVIR STITH, Presiding Judge.

G.H. (Father) appeals the termination of his parental rights to his son, Z.H., based on abandonment. Father claims the trial court erred: (1) in finding the statutory grounds for termination of his parental rights were met because, he asserts, he did not abandon Z.H., and (2) in finding that termination of Father's parental rights was in the best interest of Z.H., because the court's ruling left the child without a father or other male role model. Father asks this Court to reverse the termination of his parental rights, and to remand the case to the lower court with instructions to implement an order providing for specific visitation and child support. Finding the evidence fails to support an intent to abandon, we reverse and remand for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On August 8, 1992, Z.H. was born to Father and Mother, who were never married. Z.H. lived with Mother until February 27, 1995, when Mother was killed in an automobile accident. Z.H. was taken into protective custody and placed in a foster home in Jefferson City, Missouri. Although Father was living in Kansas City, Missouri, he arranged to visit Z.H. in Jefferson City approximately seven times in the eight months during which Z.H. was in foster care, and provided Z.H. with toys and, on occasion, clothing.[1] Pamela Gilkey, Z.H.'s maternal great-aunt, also came from her residence in the State of Texas to Jefferson City to visit Z.H. on one occasion while he was in protective custody. Both Father and Ms. Gilkey applied for custody of Z.H.

On November 3, 1995, the trial court held a hearing to determine with whom to place Z.H. The court found Father unfit to have care and custody of Z.H. based on his lack of financial support for the child, his periods of incarceration in the Missouri Department of Corrections, and his return to the Department of Corrections for a parole violation. The court gave legal care and custody of Z.H. to his great-aunt, Ms. Gilkey. Although Ms. Gilkey lived in Texas and would be moving Z.H. there to live with her, the order made no provision for visitation by Father with Z.H., nor did it order Father to pay child support. Father

---

1. While Z.H. was in foster care in Jefferson City, Missouri, Father needed to call ahead in order to arrange visits, which were only available from 8 a.m. to 5 p.m. on weekdays.

was instead instructed to contact the social worker in Dallas, Texas, in order to arrange for supervised visitation with Z.H.

For the first six months after Z.H. moved to Texas to live with Ms. Gilkey, Father was prevented from visiting him because the conditions of his parole prohibited him from leaving the state of Kansas. He called the social worker in Texas to try to get permission for his son to visit him in Kansas, but the Texas worker said he had to arrange such a visit through Missouri authorities (although, as noted, Missouri had told him to arrange visitation through Texas authorities). Although he was thus unable to see his son in person, he stayed in frequent telephone contact with his son, making some 30 calls over that six-month period and over the three months after his parole conditions were removed. Then, in August or September of 1996, Father came to Texas and met Z.H. for a visit at a toy store.

Father then went back to his home and did not visit with his son in person in Texas for some 15 or 16 months. He did, however, continue to talk with his son by telephone on a regular basis, and to talk with Mrs. Gilkey about his son. The records show that he called and either talked with his son or left a message, generally asking Mrs. Gilkey to have his son call him back, on approximately 46 occasions during this period. He also sent occasional gifts and checks, but did not send regular support.

The next in-person visit occurred a little over one year later, on December 25, 1997. Three days earlier, Father had sent his son a check which he could use to buy presents, but then decided at the last minute that he wanted to visit his son too. He called Ms. Gilkey and arranged to see Z.H. on Christmas morning. He arrived at Ms. Gilkey's home around 10 a.m. Having already sent the check, and finding the stores all closed on Christmas morning, he

had no gifts to present to his son to open that morning.[2] When Father learned that Z.H. had already opened his other Christmas gifts, and that Ms. Gilkey would soon be leaving to visit her son so that his visit would be cut short, he became upset and left in less than an hour.

Telephone records confirm that Father continued to have telephone contact with his son over the next six months, talking with him on at least one occasion every month and leaving numerous messages. In April 1998, a Petition to terminate parental rights was filed. In May 1998, Father made travel plans to fly to Texas to visit Z.H. in June 1998, but these plans were changed because Ms. Gilkey's mother passed away and she and Z.H. were going to be in Lamar, Missouri for the funeral. New arrangements were made for Father to meet with Ms. Gilkey and Z.H. at a Dairy Queen in Lamar, Missouri, for a visit before the funeral. Father was able to visit with Z.H. for approximately forty minutes on this occasion.

Following a hearing on June 28, 1998, the court entered an order terminating Father's parental rights based on a finding of abandonment. Father appeals, claiming he has not abandoned his son and has always attempted to maintain a relationship with him to the extent possible.

## II. STANDARD OF REVIEW

We will affirm the trial court's order terminating a parent's rights unless it is not supported by substantial evidence, it is against the evidence, or it erroneously declares or misapplies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *In Interest of D.T.B.*, 944 S.W.2d 321, 322 (Mo.App.1997). We review the facts and all reasonable inferences therefrom in the light most favorable to the trial court's order. *D.T.B.*, 944 S.W.2d at 322; *In In-*

---

2. Father does assert he intended to stop and pick up a Christmas gift for Z.H. on his way to Ms. Gilkey's home, but states he was un-

able to accomplish his plan because, contrary to his expectations, the stores were closed on Christmas morning.

*terest of J.M.L.,* 917 S.W.2d 193, 195 (Mo. App.1996).

### III. ABANDONMENT

■ Section 211.447.2(1) provides for the termination of the rights of a parent to a child if the termination is in the child's best interest and if clear, cogent and convincing evidence shows that the child has been abandoned. A child over one year of age has been abandoned if, for a period of six months or longer, "[t]he parent has, without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so." § 211.447.2(1)(b).[3] Abandonment is defined as the voluntary and intentional relinquishment of custody of a child with the intention that the severance be of a permanent nature, or as the intentional withholding by a parent of his care, love, protection and presence without just cause or excuse. *In re R.K.,* 982 S.W.2d 803, 806 (Mo.App.1998). Abandonment focuses on the parent's intent, taking into consideration all evidence of the parent's conduct before and after the applicable statutory period. *In Interest of G.M.T.,* 965 S.W.2d 200, 202 (Mo.App.1998).

■ Here, it is conceded by all that Father was never entirely out of contact with his son Z.H. for a six-month period. As the Juvenile Officer notes, however, the existence of nominal contacts between parent and child does not preclude a finding of abandonment, for Section 211.447.4 provides that the court "may attach little or no weight to infrequent visitations, communications, or contributions." § 211.447.4.

While Father recognizes that the courts have held that this means that a court may ignore or discount contacts which it finds to be merely token or nominal in nature, Father argues that his contacts with his son are more extensive than were the contacts in any of the cases cited by the Juvenile Officer in which contact was found to be merely nominal, and so do not permit a finding of abandonment. Our review of the cases confirms that, while Father's contacts with his son were clearly not what they should have been, no court has found abandonment where a parent has shown the degree of continued care, interest and involvement Father has shown for his son here.

Thus, in *H.D. v. E.D.,* 629 S.W.2d 655 (Mo.App.1982), the court found that a parent's contacts were nominal and would not preclude a finding of abandonment where the parent's contact was limited to one postcard, support of $25, and 4 to 10 telephone calls during a 12 to 18 month period. The court reached a similar result in *In Interest of Y.M.H.,* 817 S.W.2d 279 (Mo.App.1991), where the parent's sole contact with the child had been limited to a 10-hour visit and financial support of $33. Other cases similarly note that this level of effort is considered token and will not preclude a finding of abandonment. *See, e.g., R.L.P. v. R.M.W.,* 775 S.W.2d 167 (Mo.App.1989) (two visits during six-month period, where evidence showed parent had the ability to visit more, were considered "token" efforts); *In Interest of B.L.B.,* 834 S.W.2d 795 (Mo.App.1992) (impediments to visitation do not excuse parental obligation to continue relationship).

Here, unlike in the cited cases, Father did not make merely nominal or token efforts to stay in communication with his son. While his personal visits were minimal and, considered by themselves, could well be considered only token in nature, Father's telephone contacts with his son were continuous and real. Father testified he attempted to call Z.H. approximately one time each week, and the record shows that, during the 29 months from the time of Z.H.'s move to Texas in November 1995 until the petition to terminate parental rights was filed in April 1998, Father made approximately 79 telephone calls to Ms. Gilkey's home. It is true, as Ms. Gilkey notes, that only 18 of these 79 calls lasted

---

**3.** All statutory references are to RSMo Cum. Supp.1997, unless otherwise noted.

over 5 minutes. Ms. Gilkey said the shorter calls were mostly messages on the answering machine or calls in which only she spoke with Father, and that he often failed to take advantage of an arrangement whereby she made Z.H. available to receive calls on Sundays during a portion of this period. On the other hand, Father testified that, on occasions when he only reached the answering machine, he usually left a message asking for Z.H. to be allowed to call him back collect, but that this never happened.

In addition to the fact that Father's contacts with his son are more extensive than the contacts found in the cases in which contacts were found to be merely token in nature, is the fact that Father visited with his son extensively while his son lived in Missouri in foster care, that he maintains regular contact with his children from other relationships, that he wanted custody of Z.H. and vigorously litigated the custody issue in court, that he maintained relatively frequent contact with his child during that period, and that his personal visits with Z.H. became infrequent only once custody of Z.H. was given to Ms. Gilkey and the child was moved to Texas. Thus, Father asserts, the weight to be given to any failure on his part to visit the child or contribute to Z.H.'s financial support after he was denied custody of Z.H. should be lessened by the fact that the court placed his son in Texas with a person with whom he did not get along, without making provision for any visitation and without ordering any child support. He asserts his attempts to continue a relationship with Z.H., despite the latter's move to Texas, as well as his hiring of an attorney for the termination of parental rights hearing and for appeal of the termination of those rights, demonstrate that he did not willfully abandon Z.H.

■ Father is correct that in Missouri, "generally, a finding of abandonment is not compatible with a finding that custody has ended involuntarily." *Interest of B.C.H.*, 718 S.W.2d 158, 166 (Mo.App.1986). *See*

*also In Interest of G.M.T.*, 965 S.W.2d 200, 203 (Mo.App.1998). The reason for the rule is that "the enforced separation of parent and child and placement of the child in a foster home operates to accomplish some estrangement and, without intervention by the juvenile officer to effect reconciliation, operates to create the very circumstances which destroy the parent-child relation." *In Interest of B.B.B.*, 905 S.W.2d 118, 121 (Mo.App.1995). Thus, a number of cases have refused to find abandonment where much of the basis of the estrangement can be attributed to custody having been involuntarily taken from the parent. *See, e.g., G.M.T.*, 965 S.W.2d 200; *In Interest of Baby Girl W.*, 728 S.W.2d 545 (Mo.App.1987).

■ Of course, as Father acknowledges, involuntary denial of custody does not preclude a finding of abandonment if a parent's lack of involvement goes beyond what is attributable to the estrangement and discouragement caused by the enforced separation. *B.B.B.*, 905 S.W.2d at 121. Father argues, however, that none of the cases which have found abandonment in the face of a forced separation have involved a parent who has shown the continued interest he has shown in his son.

We agree. For example, *In Interest of B.C.H.*, 718 S.W.2d 158, 162 (Mo.App. 1986), the court affirmed termination of parental rights notwithstanding the fact the child was taken from the parent's custody involuntarily by court order, when the parent neither sought visitation nor attempted to communicate with the child for a period of over one year, and resisted all efforts to arrange contact with the child. Similarly, in *B.B.B.*, custody of the child was originally taken from the parent involuntarily, yet the court found the parent had the intent to abandon the child because the parent had only seen the child on one occasion since his birth (when his blood was tested to establish paternity), and had made only one telephone call expressing an interest in the child after

learning the child was in the court's custody. 905 S.W.2d 118.

Here, by contrast, when Father was denied custody of Z.H., the court below failed to make an express order allowing visitation or ordering support, and the Division of Social Services told him he had to make his own arrangements in Texas if he wanted to have contacts with his son there. The Division undertook absolutely no efforts to assist Father in this regard or to help maintain or improve Father's parenting skills or the parent-child relationship. Thus, every attempt made by Father to visit or communicate with Z.H. was the result of his own efforts.

And, added to the normal estrangement which results in cases where a parent is denied custody of a child, here Z.H. was removed to a far-away location out-of-state. The record clearly establishes Father made arrangements to call and visit Z.H., albeit not as often as he should have done, despite the fact he was denied custody and despite Z.H's move out-of-state, and the record fails to show any period of six months in which Father failed to make multiple telephone contacts with Z.H. Father's lack of additional in-person contact with his son and lack of regular child support is of serious concern, and, in a case in which custody had not been involuntarily denied and in which such extensive telephone contact was not maintained, this degree of contact could be found to be token and not to preclude a finding of abandonment. However, the Juvenile Officer does not cite, and our independent research fails to reveal, a case in which custody was involuntarily taken from the parent, and the parent continued to make the degree of attempts to continue a relationship with the child present here, yet the court found abandonment.

For these reasons, we find the record lacks substantial evidence of Father's intent to abandon Z.H. The judgment termi-

nating Father's parental rights to Z.H. is reversed, and we remand the case for further proceedings consistent with this opinion, including adoption of an order regarding visitation and child support.[4]

Judge HAROLD L. LOWENSTEIN and Judge JAMES M. SMART, Jr., concur.

---

**4.** Because we find that the evidence failed to support the court's termination of Father's parental rights based on abandonment, we need not reach Father's assertion that the termination of his parental rights was not in the best interest of Z.H.