76 S.W.3d 318 (2002)
In the Interest of B.S.B. and B.A.B., Plaintiff,
Juvenile Officer, Respondent,
v.
G.S.B. (Father), Appellant.
Nos. WD 60820, WD 60835.
Missouri Court of Appeals, Western District.
June 11, 2002.
*320 Michael P. Bandré, Harrisonville, for appellant.
Cathelene L. Winger, Harrisonville, for respondent.
James E. Hoke, Harrisonville, for plaintiffs.
Before LISA WHITE HARDWICK, Presiding Judge, JOSEPH M. ELLIS, Judge and RONALD R. HOLLIGER, Judge.
JOSEPH M. ELLIS, Judge.
G.S.B. ("Father") appeals from two judgments entered in the Circuit Court of Cass County terminating his parental rights to his natural son, B.S.B., and his natural daughter, B.A.B.
B.S.B. was born on July 11, 1988. B.A.B. was born on December 27, 1989. Father was married to the children's mother for about six years, although he testified that he did not remember exactly when they married. Father and Mother separated several times during the marriage and the children stayed with Father during those separations. The couple divorced in January of 1990. At the time of trial, the children had not seen their mother in six years.[1]
The Division of Family Services ("the Division") first came into contact with Father and his children in December 1998. On December 1, 1998, the Division received a report alleging that there was no heat in the household, no way to cook, and the children were being left alone. Investigation revealed the report was unsubstantiated, but Appellant did request services from the Division. As a result, the Division provided the family with immediate assistance, giving them groceries and space heaters. The family was also referred to the Intensive In-Home Services Program and received counseling from an *321 in-home therapist, clothing, bedding, furniture, transportation assistance, and other services.
On April 28, 1999, the Division received a hotline call alleging that the children had been left alone and that the home was unsanitary. Officers who responded to the call found the children alone in Father's home in Belton, Missouri, and discovered dirty dishes and piled clothing, as well as some dog feces in the home. The children were removed from the home and taken into protective custody.
On April 29, 1999, Cass County juvenile officer Douglas Oyer filed two petitions alleging that B.S.B. and B.A.B. were in need of care and treatment and requested that the court assume custody of the children. The petition alleged that Father had been arrested on April 28, 1999, on outstanding warrants in Kansas City, Missouri, for possession of a crack pipe and shoplifting. Father was unable to make bail, and B.S.B. and B.A.B. were left unsupervised in Father's home. On April 29, 1999, the juvenile judge entered two Orders of Protective Custody stating that probable cause existed to show that the children were without proper care, custody, or support and that the children were to be placed in the custody of the Division of Family Services. The children were placed in foster care.
It is unclear from the record how long Father was incarcerated, but it appears he was released within a few days after the entry of the Orders of Protection. He apparently lost possession of the household where he and the children had been residing because his first contact with the Division, shortly after his release, was to advise that he was staying with a high school friend, Mike James, in Eldon, Missouri. At that time, he left a telephone number where he could be reached. Eldon is approximately a two-and-a-half hour drive from Cass County, where the children were staying.
Sometime thereafter, social worker Deborah Buck talked to Father by telephone. She explained to Father that he would need to obtain housing suitable for himself and his children, and that, if that did not occur within a year, the Division would have to consider filing a petition to terminate Father's parental rights. To assist Father in maintaining a relationship with his children, the Division attempted to place the children with a foster family in Eldon. The Division was unable to locate a suitable family, however, and the children remained in foster care in Cass County. Buck also advised Father of social services that he could apply for, including Medicaid, housing assistance, and vocational rehabilitation.
The Division entered into at least five Written Service Agreements in an effort to reunite Father and his children between May 19, 1999, to April 3, 2000. The written agreements typically covered three-month periods of time and required Father to complete tasks such as securing appropriate housing for himself and the children, obtaining beds for the children, obtaining employment, completing a drug and alcohol assessment, visiting with the children, and attending weekly meetings with a therapist.
During this time, Father was permitted visits with his children on Sundays if he came and picked them up from foster care. During the first six months Father and children were separated, from May 1999 to November 1999, Father only visited his children three times. From November 1999 to February 2000, Father visited with his children one time. From February 2000 to May 2000, Father visited with his children three times.
*322 Father failed to comply with many of the provisions of the Written Service Agreements, such as obtaining employment and suitable housing. But he did successfully comply with other parts of the agreements. He completed a drug assessment during the third written service agreement; he attended appointments every other week with his therapist during the fourth agreement; and he completed a psychological evaluation during the fifth agreement.
The Written Service Agreements did not include provisions requiring Father to pay child support. Thus, from April 1999 through September 2000, Father did not provide any financial support for the children, although he did provide them with items such as boxes of pop tarts, jewelry, and assistance with a coin collection. There was also testimony that Father, on at least one occasion, provided his daughter with a calling card.
The record reflects that Father held numerous temporary jobs prior to February 2000. He worked briefly at "Cargill" and "Scholastic." In addition, at one time or another, he apparently worked for a tree company, a cable company, and a disposal company.
Prior to his arrest and throughout the time his children were in foster care, Father suffered from a genetic condition that caused open sores to develop on his legs. The condition caused his legs to go numb and caused blood clots to develop. Father testified that the sores on his legs made it difficult for him to work and also prevented him from making the two-and-a-half hour drive to visit his children. Amy Heithoff, a registered nurse hired by Father's aunt, D.B., to assist Father, testified that Father had a genetic disorder known as "single leiden mutation," which caused problems with blood clotting. Nurse Heithoff testified that, when she first met Father, he had extensive bruising and open sores on his legs from his ankles to his knees. She also stated that Father would have had difficulty driving because he should not remain sitting for long periods of time and should stand for ten minutes out of every hour. Nurse Heithoff also testified that she informed the Division of Father's health problems.
In February 2000, the Division received notice that the Social Security Administration had determined that Father was disabled and qualified for disability benefits. Father's qualification for benefits was based on him having been disabled for almost one year. At this point, the Division released him from the employment provision of his Written Service Agreements. Moreover, as a result of the disability determination, Father received a lump sum payment of about $6,300 for an arrearage in disability benefits and began receiving a monthly disability payment. The children began receiving payments based on Father's disability in approximately October 2000. Father did not send any of the lump sum payment to the children and, while there is evidence that he spent a couple hundred dollars on cocaine, the record also reflects that he used the rest of the money to buy furniture, thereby complying with a requirement of the Service Agreements.
On October 13, 2000, at Father's request, the court approved Father's Motion for Placement and entered two orders placing the children in the care of their paternal aunt, L.Y., in Huxley, Iowa. The court noted that a home placement study had been conducted on L.Y. and that it was determined that she was capable of providing the necessary care for the children.
The children resided with their paternal aunt, L.Y., in Iowa from October 2000 until May 2001. The children continued to receive *323 monthly payments based on Father's disability throughout this time. Because the distance was even greater than to Cass County, however, there were no in-person visits between Father and the children during this time. There was also evidence that Father made frequent efforts to contact the children by telephone and, for the most part, either talked to the children or left messages for them if they were out almost every week while they were in Iowa.
On April 10, 2001, the court held a statutory review hearing pursuant to § 210.720 and determined that it was not in the best interest of the children to return to Father's custody. On April 20, 2001, the juvenile officer filed motions to modify because L.Y. was scheduled to be in Europe during the summer and would be unable to care for the children. The motions requested that the children be removed from her home. On April 23, 2001, the court ordered that the children be returned to Missouri for placement in foster care.
Father contacted the Division on May 15, 2001, to arrange for visitation with his children. On May 17, 2001, the Division filed two petitions to terminate Father's parental rights to B.S.B. and B.A.B. The petitions alleged, as grounds for termination, abandonment, neglect and the existence of continuing, harmful conditions. The petitions also stated that Father had entered into five Written Service Agreements with the Division and had failed to comply with the terms of the agreements.
On May 24, 2001, Father contacted the Division again to request visitation. The Division arranged for supervised visitations on Saturdays. From May 2001 until the trial in October 2001, Father made all of the thirteen visits that were arranged by the Division.
On June 5, 2001, Father filed a second motion for placement, arguing that the original placement order should be amended due to changed circumstances, citing the Social Security Administration's determination that Father was disabled. Father claimed that he had previously been unable to provide financial support for his children due to his inability to work, but stated that he would be able to do so because he would be receiving disability benefits. Father stated that the disability income also allowed him to secure appropriate housing for his children. Just prior to filing the motion, Father contacted the Division to request a home study.
On October 25, 2001, trial was held on the termination petitions. The children were not present at trial and neither testified nor were they interviewed in chambers by the court. But it is undisputed that the children, then aged 13 and 11, both expressed a strong desire to live with Father. At the time of trial, the children were in different foster homes. Nonetheless, the social worker testified that the intent was to locate an adoptive family that would take both children, although there was apparently no known placement at the time.
On November 16, 2001, the court entered judgments terminating Father's parental rights to B.S.B. and B.A.B. The court determined that the evidence supported termination of Father's parental rights based on three grounds. First, the court found that Father had abandoned his children for a period of at least six months prior to the filing of the petitions. Second, the court ruled that Father neglected the children by failing to provide for them, though physically and financially able to do so. Finally, the court determined that the children had been under the jurisdiction of the court for more than one year, that potentially harmful conditions continued to exist and that there was little likelihood that the conditions would be remedied so *324 that the children could return to their Father's custody. Father brings this appeal, challenging each of the three grounds for termination that are listed in the judgments terminating his parental rights.
Termination of parental rights is one of the most serious acts courts are empowered to perform. C.B.L. v. K.E.L., 937 S.W.2d 734, 737 (Mo.App. E.D.1996). "The juvenile officer, as petitioner, bears the burden of proof," which is only met if substantial evidence, that is, evidence which, if true, has probative force upon the issues, is presented. In the Interest of M.H., 859 S.W.2d 888, 896 (Mo.App. S.D. 1993). And then only if that evidence is clear, cogent and convincing on the issues. Id. "Clear, cogent and convincing evidence `instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true.'" In re J.K., 38 S.W.3d 495, 499 (Mo.App. W.D.2001) (quoting In Interest of R.K., 982 S.W.2d 803, 806 (Mo.App. W.D.1998)).
"`In a court tried case where parental rights have been terminated, the trial court's decree will be sustained if it is in the best interest of the child and if the termination is supported by clear, cogent and convincing evidence.'" In re A.R., 52 S.W.3d 625, 633 (Mo.App. W.D.2001) (quoting In the Interest of G.M.T., 965 S.W.2d 200, 202 (Mo.App. E.D.1998)). "`The facts and reasonable inferences therefrom are reviewed in the light most favorable to the trial court's judgment with due regard given to the trial court's determination of witness credibility.'" Id.
In his first point on appeal, Father argues that the trial court erred and abused its discretion in finding that he had abandoned his children pursuant to § 211.447.4(1)(b)[2] because the evidence did not establish that he had, without good cause, left his children, for a period of six months or longer, without any provision for parental support and without making arrangements to visit or communicate with the children, although able to do so.
The juvenile officer or the Division may file a petition to terminate parental rights when it appears that a parent has abandoned a child who is more than one year of age when the petition is filed. § 211.447.4(1). The statute provides "[t]he court shall find that the child has been abandoned if, for a period of six months or longer: ... (b) The parent has, without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so." § 211.447.4(1).
In its judgment, the trial court made the following findings regarding abandonment:
The Court finds pursuant to § 211.447 RSMo. that for a period in excess of six months prior to the filing of the petition herein the biological father ... did, without good cause, leave [the children] without any provision for parental support and without making arrangements to visit or communicate with [the children] although able to do so. The Court finds that after the [children were] taken into protective custody on April 28, 1999, [Father] voluntarily moved to Eldon, Missouri, in Miller County and has resided in Eldon, Missouri, since that time and remains there today; that from April of 1999, through September of 2000, [Father] provided no financial support or parental support for [the children] although financially able to do so; that from April 28, 1999, through May 5, *325 2001, [Father] visited only seven (7) times with [the children].[3]
Father argues that he did not abandon his children because they were involuntarily taken from his custody and placed in foster care when he was incarcerated. In addition, Father claims that the evidence shows that he was unable to visit his children more frequently and provide them with support because Father suffered from a serious disability that prevented him from making the two-and-a-half hour drive to visit his children more frequently. Therefore, Father claims that the State has failed to meet the standard set forth in the statute that he failed to visit his children "although able to do so." Father also contends that the evidence failed to establish any period of six months or longer in which he left the children without any provision for parental support and without making arrangements to visit or communicate with the children. Specifically, he asserts the trial court abused its discretion by disregarding his telephone communications with the children.
"Abandonment focuses on the parent's intent taking into consideration all evidence of the parent's conduct, including conduct before and after the statutory period." In Interest of G.M.T., 965 S.W.2d 200, 202 (Mo.App. E.D.1998); See also In re C.M.D., 18 S.W.3d 556, 561 (Mo.App. W.D.2000). "Abandonment has been defined as a willful, positive act such as deserting the child; a willful delivery of the child with intention that the severance be permanent; a voluntary and intentional relinquishment of the custody of the child to another with the intent to never again claim the rights of a parent or perform the duties of a parent." In re Adoption of H.M.C., 11 S.W.3d 81, 87 (Mo.App. W.D. 2000). Abandonment is also defined "as the intentional withholding by a parent of his care, love, protection and presence without just cause or excuse." Interest of R.K., 982 S.W.2d at 806. "A transfer of custody for any reason may ripen into abandonment if the absent parent foregoes the performance of the function of a parent which demonstrate the continued intent to exercise the rights and duties of a parent." In re Adoption of H.M.C., 11 S.W.3d at 87.
"`[G]enerally, a finding of abandonment is not compatible with a finding that custody has ended involuntarily.'" Z.H. v. G.H., 5 S.W.3d 567, 571 (Mo.App. W.D.1999) (quoting Interest of B.C.H., 718 S.W.2d 158, 166 (Mo.App. W.D.1986)). "The reason for this rule is that `the enforced separation of parent and child and placement of the child in a foster home operates to accomplish some estrangement and, without intervention by the juvenile officer to effect reconciliation, operates to create the very circumstances which destroy the parent-child relation.'" In Interest of B.B.B., 905 S.W.2d 118, 121 (Mo. App. W.D.1995) (quoting In Interest of Baby Girl W., 728 S.W.2d 545, 549 (Mo. App. W.D.1987)). "This rule is also explained by the fact that `the opportunities for parental association and the incentives to provide monetary support are subtly discouraged when the Division has assumed custody.'" Id. (quoting In Interest of W.F.J., 648 S.W.2d 210, 215-16 (Mo. App. W.D.1983)). Involuntary denial of custody will not preclude a finding of abandonment in all cases. Z.H. v. G.H., 5 S.W.3d at 571. "Sometimes, the evidence may demonstrate that a parent's lack of involvement may go beyond what is attributable *326 to the estrangement and discouragement caused by the enforced separation, in which case the lack of involvement would indicate a settled purpose of willful abandonment." In Interest of B.B.B., 905 S.W.2d at 121.
A careful review of the record reveals that Respondent has failed to demonstrate that Father, without good cause, left the children without any provisions for parental support and also failed to communicate with his children for a period of six months or longer. The children were involuntarily taken into protective custody on April 29, 1999. Deborah Buck, the Division's caseworker, testified regarding Father's visits with the children prior to their move to Iowa in October 2000. Her testimony established that Father visited his children three times between August 16, 1999, and November 16, 1999. He visited them just one time in the period from November 1, 1999, to February 1, 2000. And he visited the children three times between February 17, 2000, to May 17, 2000. In addition, Buck testified that Father talked to his children on the telephone seven times during the period from April 29, 1999, to October 2000, although she did not provide dates for those phone calls.
While Father's evidence would suggest more visits and more phone calls than documented by the Division, it is uncontroverted based on Buck's testimony that there was no period of six months or longer in which Father failed to visit or communicate with the children between April 29, 1999, and October 2000. The longest period of time established by the evidence during which the children did not visit in person with Father or receive support from him was approximately four months, from May 18, 2000, through September 2000. And even during that time, based on Buck's testimony regarding telephonic communication, there may have been communication between Father and the children.
Moreover, even if we assume that Father did not communicate with his children while they were in Iowa, from October 2000 to May 2001, the undisputed evidence shows that during that time the children received regular support of about $400 per month because of Father's disability. Accordingly, the record simply does not support the trial court's finding that Father failed to communicate with his children and failed to provide them with support for a period of six months or longer.
Nonetheless, Respondent notes that, pursuant to § 211.447.7, the trial court "may attach little or no weight to infrequent visitations, communications, or contributions." Our courts have determined that a trial court "`may regard such efforts as token and terminate parental rights despite their existence.'" In re A.R., 52 S.W.3d at 634 (quoting In re R.K., 982 S.W.2d 803, 806 (Mo.App. W.D.1998)). Moreover, "[a] parent is not allowed to maintain only a superficial or tenuous relationship with her child in order to avoid a determination of abandonment." In re C.M.D., 18 S.W.3d at 562. Respondent cites In the Interest of J.W., 11 S.W.3d 699, 704 (Mo.App. W.D.1999), to support his argument that nominal or token communications will not preclude a finding of abandonment. In J.W., we affirmed a trial court's determination of abandonment where the evidence showed that over a period of two years, a mother had visited her children ten times, failed to communicate regularly with them and failed to support them financially. Id. The evidence showed there was no period of exactly six months where the mother had failed to visit her children, but that there were "two periods of just slightly under six months during which the children went without any type of contact with Mother." Id. We *327 determined that "[t]he provisions of the statute authorizing termination must be read with a measure of common sense and reasonableness, and not interpreted in a hyper-technical fashion." Id. We then held that it was reasonable for the trial court to find that the mother's contacts with her children were nominal, because she rarely visited and provided little or no support for them. Id. at 704-05.
In the case at bar, based on Deborah Buck's testimony, Father had in person visits with the children fewer times between May 1999 and May 2001 than did the mother in J.W. However, unlike the mother in J.W., Father provided continuous financial support to his children beginning in October 2000, seven months prior to the filing of the petitions seeking to terminate his parental rights. In addition, the evidence shows that Father spoke to his children on the telephone at least seven times from May 1999 to October 2000. In J.W., the mother had checked on her children by calling their caretakers, but she never asked to speak with them. Id. at 702. Thus, Father's visits, phone calls, and financial support demonstrate a significantly greater level of parental care, interest, and involvement with the children than was present in J.W.
Father's contact with his children was certainly not what it should have been, and we do not condone Father's lack of financial support or his lack of personal contact with the children. But Respondent fails to cite to a case where a Missouri court has held that a parent abandoned his or her children where the parent has visited with, and provided the amount of support to, his or her children as Father has done in this case. Support for the conclusion that Father made more than a token effort to communicate with and support his children is found in Z.H. and A.R. and the cases on which they rely. In Z.H., we reversed a trial court's finding of abandonment despite evidence showing that a father had minimal personal visits with his son and did not provide regular support, where the evidence showed that father maintained regular telephone contact with his son and also provided occasional gifts and support. Z.H., 5 S.W.3d at 570-71. In A.R., we determined that the trial court erred in finding that a father had abandoned his daughter where the evidence showed that the father, during a seven-month period, attended six family therapy sessions, three individual therapy sessions, two family court hearings and a family support meeting. A.R., 52 S.W.3d at 634. In addition, the father had taken his daughter trick-or-treating for Halloween, attended a parent/teacher conference, attended a father/daughter breakfast, and had overnight visitation with his daughter three times, although the father's additional requests for visitation were denied. Id. at 634-35. The evidence also showed that the father had purchased food, clothing and gifts for his child. Id. at 635.
In both Z.H. and A.R., we held that the parents had maintained contact with their children that was more than nominal or token. Z.H., 5 S.W.3d at 570; A.R., 52 S.W.3d at 635. In the case at bar, Father's contact with, and support for, his children also went beyond that which could be characterized as nominal or token. See H.D. v. E.D., 629 S.W.2d 655, 657-58 (Mo. App. E.D.1982) (holding that a parent's contact was nominal and would not preclude a finding of abandonment where contact was limited to one postcard, support of $25, and four to ten telephone calls during a twenty month period); In Interest of Y.M.H., 817 S.W.2d 279, 283 (Mo. App. W.D.1991) (holding parent's contact was token where parent's sole contact during a ten-month period was a ten-hour visit and financial support of $33); In the Interest of B.C.H., 718 S.W.2d 158, 161-62 (Mo. *328 App. W.D.1986) (affirming a finding of abandonment despite the fact that child was taken from parent's custody involuntarily where parent did not seek visitation or attempt to communicate with child for a period of twenty to twenty-one months and resisted all efforts to arrange contact with child); In Interest of B.L.B., 834 S.W.2d 795, 799-800 (Mo.App. E.D.1992) (affirming determination of abandonment where evidence showed that parent visited child one time in a six-month period and provided no support to child despite the fact that the trial court then suspended visitation because impediments to visitation do not excuse parental obligation to communicate with child by letter or telephone).
Respondent failed to meet his burden of showing by clear, cogent and convincing evidence that Father intended to abandon B.A.B. and B.S.B. by failing to communicate or visit them and failing to provide them with support for a period of six months or longer prior to the filing of the petitions to terminate parental rights. As a result, the trial court's finding that Father abandoned the children must be reversed.
"`Because the existence of one of the statutory grounds is a sufficient condition for termination of parental rights, provided termination is in the best interest of the child,' we must also consider Father's claims that the trial court's findings under § 211.447.4(2) and (3) were not supported by the evidence." In re A.R., 52 S.W.3d at 637 (quoting In re C.M.D., 18 S.W.3d at 564).
Father argues in his third point[4] that the court erred and abused its discretion in finding that he neglected his children. He asserts that a parent does not neglect his children, as defined in § 211.447.4(2)(d), if the parent is unable to physically or financially care for the children because of a medical condition and that the evidence established that he had a physical condition that prevented him from physically or financially caring for the children. He further contends that, even if there was evidence that would support a finding of neglect, it had been remedied long before the filing of the petitions to terminate parental rights.
Section 211.447.4(2) provides that the juvenile officer may file a petition to terminate parental rights when it appears that the child has been abused or neglected. The statute then provides, in pertinent part:
In determining whether to terminate parental rights pursuant to this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:
(a) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
(b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control;
(c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts were being *329 committed toward the child or any child in the family; or
(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development;
§ 211.447.4(2).
In ruling that Father had sufficiently neglected the children so as to justify termination of his parental rights, the court first noted that on August 10, 1999, it had entered two Findings of Jurisdiction and Judgments of Disposition finding that B.S.B. and B.A.B. had been neglected. Those judgments provided, inter alia:
On the admission of the parties and after presentation of evidence, the Court finds the following allegation in the Petition filed by the Juvenile Officer is true and correct:
Pursuant to 211.031.1(1)(a) RSMo., the parents or other persons legally responsible for the care and support of the child or person seventeen years of age, neglect or refuse to provide proper support, education which is required by law, medical, surgical or other care necessary for [the child's] well-being, in that, on or about April 28th, 1999, the said juvenile's father ... was arrested for outstanding warrants in Kansas City, Missouri. [Father] could not make bail, leaving the juvenile without proper care, custody or support. Further, Officer Kampe of the Belton Police Department, reports that the residence at which the juvenile resides was found to be covered with dirty clothes, dishes and dog feces. The juvenile reports that her and her brother are often left alone at night.
The court then went on to make the following findings to support its decision to terminate based on neglect:
[F]ather has repeatedly failed although physically and financially able, to provide [the children] with adequate food, clothing, shelter, education or other care and control necessary for her physical, mental, or emotional health and development; that [Father] does not suffer from a mental condition which renders him unable to knowingly provide [the children] with the necessary care, custody and control. This Court finds that [Father] has maintained various jobs in the past despite his medical condition up until the time he began receiving Social Security disability, and although currently receiving disability is allowed to earn up to $700 per month; that in the Spring of 2000, [Father] received a lump sum disability benefit of almost $7,000 and failed to provide [the children] with any food, clothing or shelter, and chose to move to Eldon, Missouri, instead of moving to a place near his [children], rendering visitation with his [children] a rarity.
The Court does find that [Father] has a chemical dependency, but said dependency does not prevent him from consistently providing [the children] with care, custody and control.[5] The court finds that there was no evidence adduced regarding a severe act or recurrent acts of abuse by [Father] toward any child.
*330 Father argues that even if he neglected his children prior to October 2000 by failing to pay support and failing to use his disability award to move closer to his children, the trial court next needed to determine if the neglect had been remedied. In support of this contention, Father relies on In the Interest of J.K. v. T.K., 38 S.W.3d 495, 500 (Mo.App. W.D.2001) for the proposition that "it is the continued existence of an unremedied, neglectful situation that is the ultimate issue." Father's reliance is misplaced. The above-cited quote is taken from a portion of the opinion dealing with a different subsection of the statute than the one at issue here. The court in J.K. was determining whether the evidence supported termination of a mother's parental rights pursuant to § 211.447.4(3). Id. at 499. That subsection allows termination when the child has been under the court's jurisdiction for one year and "the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied...." Id. (quoting § 211.447.4(3)). The issue now before us is whether Father's parental rights were properly terminated pursuant to § 211.447.4(2), which allows for termination when the child has been abused or neglected.[6]
Respondent argues, and the trial court determined, that Father was physically and financially able to pay support prior to the time the children began receiving disability benefits because he held many jobs prior to that time. Social worker Buck testified that Father did not provide any financial support to his children from April 1999 to September 2000. Buck stated that Father did provide his children with items such as boxes of pop tarts, jewelry, and help with a coin collection. On at least one occasion, the record also shows that Father provided his daughter with a calling card to be used to call Father.
Our review of the record reveals that Respondent's evidence concerning Father's employment was, at best, inconclusive. Social worker Buck testified that Father was working at a variety of different jobs prior to the time he qualified for disability benefits. Buck testified that Father held jobs at "Cargill" and "Scholastic." In addition, she stated he worked for "a tree company, a cable company, a disposal company ... There were a lot of different companies." There was also testimony that Father worked part-time for a taxi company in July 2000. But Respondent presented no evidence showing the length of time Father held any of those jobs, how many hours he worked, or how much money he earned.
At the same time, Buck testified that Father failed to comply with the provision of his Written Service Agreements requiring him to obtain employment. When asked whether Father had found employment pursuant to the terms of the first Written Service Agreement, which covered the time period between May 19, 1999, and June 1999, Buck stated, "He was trying to find employment, but had not found anything as of yet." When asked if he had found employment to comply with the second Written Service agreement, which covered the time period between August 16, 1999, to November 16, 1999, Buck stated, "He was still looking for employment." The social worker did not testify whether Father obtained employment during the third Written Service Agreement, which covered the time period between November *331 1, 1999, to February 1, 2000. The fourth Written Service Agreement began in February 2000, and at that time Father was excused from the work clause because the Division was notified that Father was disabled.
Also running counter to Buck's confusing testimony regarding Father's many jobs is the disability determination of the Social Security Administration. It found that Father was totally disabled and entitled to disability benefits and that he "became disabled under [the Administration's] rules, on March 10, 1999," which was a month before his children were taken into protective custody by the Division. The SSA decision went on to state that Father was entitled to benefits beginning in September 1999 and that he would be receiving a sum of about $6,300 to cover benefits due to him from September 1999 through April 2000. We recognize that a Social Security determination is not binding on Missouri Courts. Ralph v. Lewis Bros. Bakeries, Inc., 979 S.W.2d 509, 516 (Mo. App. S.D.1998). Nevertheless, under the peculiar circumstances of this case, where Respondent's own evidence regarding Father's actual work and his ability to work is inconclusive, it is of considerable importance in evaluating whether there was clear, cogent, and convincing evidence of neglect sufficient to justify termination of Father's parental rights.
Not only is the evidence concerning Father's employment lacking, Buck testified that none of the Written Service Agreements included a provision that Father pay child support. "While Father's obligation to provide support to his [children] is not dependent upon the state informing him of that obligation, the fact that Father clearly provided some support to [his children] and that Respondent failed to inform him that his efforts were inadequate is a relevant consideration in determining the level of support that was provided by Father and whether his conduct rose to the level of neglecting [his children]." In re A.R., 52 S.W.3d at 640 (internal citation omitted); But see In re A.H., 9 S.W.3d 56, 60 (Mo.App. W.D.2000) ("Although the DFS did not demand that mother support her child, a parent's duty to support the parent's child does not abate while the child is in the custody of DFS."). We note that in the case at bar, Father was notified by the court that his support was inadequate when the court determined on August 10, 1999, that Father had neglected his children. However, pursuant to those judgments, Father was never ordered to pay child support. Rather, he was ordered to comply with the Written Service Agreements, none of which included a child support provision. This fact seems especially relevant where the evidence shows that Father suffered from a serious health condition that compromised his ability to work and ultimately led the Social Security Administration to declare that he was totally disabled as of March 10, 1999, a full five months before the trial court's neglect determination on August 10, 1999.
The undisputed evidence shows that the children began receiving Social Security benefits of about $400 per month in October 2000, due to Father's disability. The trial court's judgment reflects this, stating only that Father failed to support his children from April 1999 through September 2000. The petitions to terminate parental rights were filed in May 2001. Accordingly, the evidence shows that Father began providing his children with continuous financial support a full seven months before the petitions to terminate parental rights were filed. Prior to this time, the undisputed evidence shows that Father was struggling with a serious health condition that interfered with his ability to keep a job and ultimately led to a determination that Father was disabled. Father evidently *332 held some temporary jobs, but it is unclear from the record when he was employed, and Respondent's evidence suggests that he was not employed during the first six months the children were in foster care.
In the case at bar, Father provided more support than the parents in either A.R. or M.H., two cases where our courts reversed orders terminating parental rights because the evidence was insufficient to support a finding of neglect. In re A.R., 52 S.W.3d 625, 639-40 (reversing termination based on neglect where evidence showed that father provided child with unspecified amount of food, clothing and gifts while child was in foster care, record did not support finding that gifts were "token," and father was never told that his support was inadequate); In Interest of M.H., 859 S.W.2d at 895-96 (holding that evidence did not support termination of a father's parental rights based upon neglect where treatment plan required him to pay $1 a week in child support and evidence showed father had made a payment of $35 and that the Division seemed agreeable to father paying a couple of months at a time rather than each week because payment had to be made by cashier's check and no evidence was presented showing father's ability to pay more support).
"The clear, cogent and convincing standard is more stringent than that of `preponderance of the evidence.'" In re A.M.C., 983 S.W.2d 635, 637 (Mo.App. S.D.1999). "It has been said that the clear, cogent and convincing standard requires that the matter under consideration be established by the clearest of evidence, and upon testimony entirely exact and satisfactory." Id. at 640. We cannot conclude that the record before us demonstrates "clear, cogent and convincing" evidence that Father has repeatedly or continuously failed, although physically or financially able, to provide the children with adequate support pursuant to § 211.447.4(2). Therefore, the trial court's finding that Father's parental rights should be terminated pursuant to that subsection must be reversed. In re A.R., 52 S.W.3d at 640.
We must next determine whether the trial court properly terminated Father's parental rights under § 211.447.4(3), which allows for termination of parental rights when:
The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:
(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;
(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;
(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent *333 unable to knowingly provide the child with the necessary care, custody and control;
(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control
Father claims in his fourth point that the trial court erred in terminating his parental rights pursuant to § 211.447.4(3) because the conditions leading to assumption of jurisdiction by the juvenile court had been remedied by Father before the petitions to terminate his parental rights were filed. According to the statute, however, Father's parental rights may also be terminated pursuant to this subsection if "conditions of a potentially harmful nature continue to exist." The ultimate issue when applying this subsection of the statute for continuation of conditions of neglect "is the continued existence of an unremedied, neglectful situation." In re J.K., 38 S.W.3d at 500. "The apparent purpose of [Paragraphs (a) and (b)] is to ensure that all reasonable means to help the parents remedy the adverse conditions are utilized, and that courts will not terminate parental rights where such efforts have not been made." In the Interest of R.L.K., 957 S.W.2d 778, 782 (Mo.App. S.D. 1997).
In determining that Father's parental rights could be terminated based on this subdivision of the statute, the court stated the following:
The Court finds that [the children have] been under the jurisdiction of the Juvenile Court for a period in excess of one year and conditions of a potentially harmful nature continue to exist and there is little likelihood that these conditions will be remedied at an early date so that [the children] can be returned to [Father] in the near future and the continuation of a parent-child relationship greatly diminishes [the children's] prospects for early integration into a stable and permanent home. The Court finds that [Father] currently and for at least the last six (6) months has resided with his paramour and her four children in Miller County; that [Father's] residence is unsuitable and conditions of a potentially harmful nature continue to exist as the children, or his paramour, in [Father's] home have delinquency problems, suicide issues and mental retardation handicaps as well as documented hotlines in Miller County. The Court finds that [Father] has failed to comply with five Written Service Agreements that he entered into with the Cass County Division of Family Services; that the Juvenile Office and the Division of Family Services have been unsuccessful in their efforts to aid [Father] on a continuing basis in adjusting his circumstances or conduct to provide a proper home for [children] despite numerous services and assistance offered to [Father] for the last three (3) years. The services provided include Intensive In-Home Services, counseling, Medicaid, referrals for Vocational Rehabilitation and ... Housing, visitation, psychological evaluation, referrals to the Opportunity Center and Missouri Public Service and food stamps, all of which have been unsuccessful; that the father has made no monetary payments for the cost of care and maintenance of [children] when financially able to do so from April of 1999 through September 2000; that additional services would not be likely to bring about a lasting parental adjustment enabling a return of [children] to... father within an ascertainable period of time; that [Father] has shown a disinterest in and a lack of commitment to *334 [children]; and that [Father] has failed to maintain regular visitation or other contact with [children] until after the Petition to terminate his rights was filed in May of 2001.
Trayon Murray, a social worker in Miller County, conducted a home study of Father's residence in Eldon on June 8, 2001. Father moved into the home in May 2001 with his girlfriend, S.C., and her four children. At the time of trial, S.C.'s children were seventeen, fourteen, eight and six. Murray stated that there was nothing wrong with the appearance of the home. Father testified that there were three bedrooms in addition to the master bedroom and beds for all of the children. Father submitted pictures of the exterior and interior of the home.
Nonetheless, in his report, Murray refused to approve the home as an appropriate placement for B.A.B. and B.S.B. Murray testified that his reason for denying approval was his concerns about S.C.'s children. Murray testified that S.C.'s oldest son had serious mental health problems and that he was suicidal. He also stated the Division had received four hotline calls that S.C. was not giving her son his medication. In addition, Murray testified that S.C. called the Division on four occasions stating that Father needed to attend parenting classes because he did not know how to "handle teenagers" and that he had problems dealing with her oldest son's depression and suicidal tendencies. Furthermore, Murray stated that S.C.'s second oldest son had "several run ins with the juvenile court" and was a delinquent, although he did not provide details of specific instances. He also stated that S.C.'s youngest child had a learning disability. Murray's ultimate conclusion was that S.C. already was having difficulties with her four children, Father was having trouble dealing with her oldest son, and allowing B.S.B. and B.A.B. to move into the house would create "added stress."
S.C. acknowledged that her oldest son suffered from seizures and attention deficit disorder, was highly depressed, and was taking several medications. She denied that she ever neglected to give him his medication. Rather, she stated that he did not take his medication when he went to visit his father. She stated that, at the time of trial, her son was not visiting his father and that she was personally giving him his medication every day. She also denied that her second oldest son had ever been detained in a juvenile justice facility or in trouble with law enforcement authorities. S.C. testified that her eight-year-old has a learning disability but that he was receiving tutoring at school.
The undisputed evidence shows that S.C.'s oldest son suffered from psychiatric problems serious enough to require medication and that on some occasions he did not receive his medication. The evidence also showed that Father had difficulty dealing with S.C.'s son's mental health problems. However, there was no evidence that S.C.'s oldest son was violent or that he presented a danger to others. Furthermore, the evidence concerning alleged problems with S.C.'s other children was lacking. There was no evidence to support the trial court's determination that any of S.C.'s children were mentally retarded, only that one of them had a learning disability.
The trial court also noted Father's noncompliance with the Written Service Agreements and the failure of the Division and other agencies to assist Father in providing a more suitable home for his children. While Father certainly did not comply perfectly with all of the conditions of the Written Service Agreements, the record reflects that he made numerous *335 attempts to comply with many of the Division's demands. Buck acknowledged that Father applied for Section 8 Housing but was turned down. She suggested he apply for low-income housing through a different program and was unsure if he had done so. She stated that he applied for Medicaid, as directed, and was apparently turned down initially but was later approved. Furthermore, he also applied to Vocational Rehabilitation, as directed by the Division. Apparently, Father had received assistance for problems with carpal tunnel, and Buck stated that it was "unclear" whether he qualified for further assistance. Buck also noted that Father attended some counseling sessions, although not all of them, completed a psychological evaluation, and submitted to a drug assessment. While Buck testified that Father failed to find suitable employment, she also testified that he held many jobs, at least on a temporary basis, prior to February 2000. Finally, the Written Service Agreements required Father to secure housing, with beds, for his children. The record shows that Father did secure housing by May 2001. While the Division stated that the housing was unsuitable due to S.C.'s children, the Division also determined that there was nothing wrong with the appearance of the home and that it apparently was adequately furnished.
We also note that the trial court refers to the Intensive In-Home Services program, which was offered to Father in December 1998. Through this program, Father received in-home counseling, food, space heaters, and other assistance. Father received this assistance four months prior to his arrest. Presumably, Father was successfully caring for his children during this time, otherwise, we assume the Division would have taken steps to remove the children prior to his arrest. We fail to understand, therefore, how the trial court could have determined that this program was "unsuccessful" in assisting Father to provide a suitable home for his children. Accordingly, the evidence shows that Father made numerous efforts to comply with the terms of the Written Service Agreements, and it is against the weight of the evidence to state that all services offered to Father were "unsuccessful."
In sum, the only "harmful" condition cited by the trial court involves the alleged problems suffered by S.C.'s children and the "additional stress" that social worker Murray feared would be created by allowing B.S.B. and B.A.B. to move into the home. "None of the findings identify any condition of a potentially harmful nature related to Father that continue to exist, and our review of the record does not disclose any such condition." In re A.R., 52 S.W.3d at 641-42. In addition, the trial court's determination that Father has failed to comply with all of the Written Service Agreements and that all efforts to provide assistance to Father have been "unsuccessful" is not supported by the record. "[T]he evidence adduced by Respondent at trial, when weighed against the opposing evidence, does not `instantly tilt the scales' in favor of terminating Father's parental rights under § 211.447.4(3)." Id. at 643. Accordingly, the trial court's termination of parental rights on this basis must be reversed.
"Termination of parental rights requires strict and literal compliance with the statutes." In re A.M.C., 983 S.W.2d at 640. Parental rights should be terminated only when grave and compelling reasons exist. Id. The issue is not whether the children would be better off in another home. Id. Although the primary concern is always the best interests of the children, before the court can reach the issue of children's best interests, "there must be *336 sufficient proof of acts authorizing termination under the statutes." Id.
As noted previously, the clear, cogent and convincing standard means that matters must "be established by the clearest of evidence, and upon testimony entirely exact and satisfactory." Id. Our review of the record leaves us with the conclusion that there was insufficient evidence to authorize the termination of Father's parental rights. We are, therefore, compelled to reverse the trial court's ruling to the extent it did so. Reversal of the court's orders has no bearing on the issue of custody. In re A.R., 52 S.W.3d at 643. Physical custody of B.A.B. and B.S.B. shall remain with the Division subject to reasonable visitation rights by Father deemed appropriate by the trial court, and custody "should not be given to Father unless and until the ... court determines that the environment in which [B.A.B. and B.S.B.] would be living creates no reasonably foreseeable risk of harm to [their] physical and emotional well-being." Id.
All concur.
NOTES
[1] It is unclear from the record where the children's mother was living at the time of trial. Pleadings filed by Father state that the children's mother, L.A.N., was incarcerated in Arkansas. The petitions to terminate parental rights provided a Kansas address for the children's mother. Father testified that the children's mother had been in prison and was released, but that he had spoken to her family prior to trial and that they believed she was in prison again. Father stated he did not have an address for the prison but that it was in Tennessee. The petitions requested the termination of Father's and L.A.N.'s parental rights. The trial only addressed Father's parental rights and the judgments only terminated Father's parental rights.
[2] All statutory references are to RSMo 2000, unless noted otherwise.
[3] The trial court entered separate judgments terminating Father's parental rights to B.S.B. and B.A.B. The wording of each judgment is identical. We have quoted from one judgment and inserted the phrase "the children" where the name of one child would appear in each judgment.
[4] Because we determine that Father did not abandon his children, we need not consider Father's second point, in which he argues that he repented the abandonment.
[5] The record indicated that Father began using cocaine in 1992. He used it for a year before going into drug treatment. He stated that he did not use cocaine for several years and then began using it on a regular basis before going back into treatment. He admitted to spending a couple hundred dollars on cocaine in April or May of 2000. Mike Schmitz, a psychologist who completed an evaluation of Father in July 2000, testified that Father told him he had used cocaine about a month prior to the evaluation.
[6] The trial court in J.K. also determined that there was sufficient evidence to terminate parental rights pursuant to § 211.447(2), but we affirmed pursuant to § 211.447(3) and, therefore, did not analyze the case under that subsection.