### In the Interest of B.N.W., a child under seventeen years of age.

### L.K.T. a/k/a L.K.S., Movant–Appellant,

v.

### Greene County Juvenile Office, Respondent.

#### No. 25355.

Missouri Court of Appeals, Southern District, Division Two.

Aug. 22, 2003.

Application for Transfer to Supreme Court Denied Sept. 4, 2003.

Application for Transfer Denied Oct. 28, 2003.

John E. Kelly, Springfield, for appellant.

Bill Prince, Springfield, for respondent.

NANCY STEFFEN RAHMEYER, Chief Judge.

L.K.T. ("Mother"), the biological mother of B.N.W., appeals from a trial court order terminating her parental rights.[1] In the

---

1. The parental rights of the alleged biological father, T.D.W., were also terminated; howev-
er, he does not appeal the termination. The facts relevant to father's termination will be

order, the trial court set forth three distinct statutory grounds for the termination. Specifically, the court determined that: (1) the minor child had been abused and/or neglected, pursuant to section 211.447.4(2);[2] (2) the minor child had been in the jurisdiction of the juvenile court for more than one year, and that the conditions which initially resulted in the court's assumption of jurisdiction continued to exist and were unlikely to be remedied in the near future, pursuant to section 211.447.4(3); and (3) both Mother and T.D.W., the putative father, are unfit to be parties to the parent/child relationship due to the commission of sexual abuse, pursuant to section 211.447.4(6). We affirm.

Despite the fact that the trial court found three statutory bases warranting termination, Mother brings only one point on appeal. She claims:

> The trial court erred in terminating the parental rights of [Mother] because the trial court's determination that [Mother] failed to rectify the conditions which led to removal and that [Mother] was an unfit parent was against the weight of the evidence in that [Mother] had established an appropriate and safe environment for the minor child, had substantially complied with her treatment plan, had established a new married life without the abusive natural father [T.D.W.], and was capable of caring for the minor child, that is, was not "unfit."

While Mother's point on appeal leaves much to be desired in the way of clarity, she appears to be contending that the trial court erred with respect to its section 211.447.4(3) finding, namely that Mother failed to rectify the conditions which led to the removal of the minor child. Mother

does not, however, challenge the other grounds set forth in the order terminating her parental rights.

■ Where multiple statutory grounds for termination of parental rights are found, in order to affirm the judgment the appellate court need only find that one of the statutory bases was proven and that the termination was in the best interest of the child. *See In re M.J.*, 66 S.W.3d 745, 747 (Mo.App. S.D.2001); *see also In re J.L.M. & C.S.M.*, 64 S.W.3d 923, 925 (Mo. App. S.D.2002) ("One ground for termination adequately pleaded and proven is sufficient to support termination."). Thus, if an appellant fails to challenge each of the termination grounds found by the trial court, it is unnecessary for the appellate court to address the specific ground that is challenged. *See In re M.J.*, 66 S.W.3d at 747–48. In this case, then, because Mother has failed to challenge the termination ground of abuse/neglect or the ground of the presumption of parental unfitness, we need not address the failure to rectify ground that she has challenged. *See id.* However, because the termination of parental rights is one of the most serious acts a court is empowered to perform, *see In re B.S.B. & B.A.B.*, 76 S.W.3d 318, 324 (Mo.App. W.D.2002), we review the evidence *ex gratia* to determine whether the juvenile officer established at least one ground for termination by "[c]lear, cogent and convincing evidence." *See In re C.N.H.*, 998 S.W.2d 553, 560 n. 2 (Mo.App. S.D.1999).

■ On appeal, Mother claims that she is a "co-victim" of T.D.W., a sexual deviant who is also the putative father of the minor child. Specifically, she alleges that T.D.W. controlled her psychologically and coerced her into engaging in dangerous and destructive behavior. When con-

recounted only as they bear on the decision to terminate Mother's parental rights.

2. All references to statutes are to RSMo 2000, unless otherwise indicated.

sidering the evidence adduced at trial, we review the facts and reasonable inferences therefrom in the light most favorable to the trial court's order to determine whether the order of termination is supported by clear, cogent, and convincing evidence. *In re A.R.*, 52 S.W.3d 625, 633 (Mo.App. W.D. 2001). After reviewing the evidence in the case at hand, we find that it clearly established that the minor child was abused and neglected, and that Mother was instrumental in this abuse and neglect.

In 1998, Mother, T.D.W., and the minor child resided in the State of Mississippi. In the spring of that year, Mother came to the attention of the Mississippi juvenile authorities when she was arrested for engaging in prostitution at a casino, supposedly with the encouragement of T.D.W. At that time, to prevent the state from retaining custody of B.N.W., Mother and T.D.W. voluntarily placed the child into the care of her paternal grandmother. The paternal grandmother subsequently returned the child to Mother and T.D.W. only after they promised that would have no further involvement with prostitution.

Mother then contends that, following the Mississippi incident, she did not engage in prostitution for approximately two to three years, when T.D.W. again pressured her into it. At any rate, the facts show that, in May of 2000, B.N.W. was found alone in an automobile outside of a Springfield motel while Mother was engaging in acts of prostitution inside. On that occasion, B.N.W. was allowed to stay with the parents; however, within weeks, history repeated itself, and the child was again discovered in a motel parking lot, alone in a vehicle, while Mother was inside engaging in prostitution. This time, Mother was arrested, and the child was taken into protective custody. Additionally, Mother acknowledged

that she had been involved in approximately forty prostitution calls in the three weeks before she was arrested and B.N.W. was taken into protective custody. T.D.W., along with the minor child, transported Mother to each of these calls and waited outside the designated motel while Mother consummated the transactions.

In addition to the evidence regarding Mother's involvement with prostitution, all of the witnesses indicated that T.D.W. was a sexual addict and deviant. T.D.W. himself indicated to his probation officer that he enjoyed having sex with Mother in front of an audience, and if an adult audience could not be found the parents would instead have sex in the presence of B.N.W. He also indicated that he and Mother engaged in sexual intercourse in the presence of B.N.W. on an average of four to five times per week.

Even after B.N.W. was placed in protective care, and after Mother was advised to discontinue any further contact with T.D.W., Mother continued to meet with T.D.W. for sexual liaisons—this time in the presence of their after-born child.[3] T.D.W. commemorated these clandestine trysts by taking nude photographs of both Mother and the after-born child. Realizing that she was acting contrary to the advice of her Division of Family Services ("D.F.S.") caseworker, Mother hid her ongoing relationship with T.D.W. from his mother, from the D.F.S. caseworkers, and from her therapist. The relationship finally came to an end only when T.D.W. was subsequently incarcerated on unrelated charges.

In addition to meeting with T.D.W. against the advice of her caseworker, Mother also refused to comply with other D.F.S. directives. While she was referred to a therapist for counseling, Mother ter-

---

**3.** Mother placed the after-born child with her own mother to prevent the Division of Family   Services from taking custody of the child.

minated the counseling after seven sessions based on her own opinion that the therapy sessions were not helpful. Furthermore, while Mother eventually attended parenting classes, by her own admission, she did so only after the petition to terminate parental rights had been filed.

Certainly, clear, cogent, and convincing evidence of abuse and neglect exists which supports the termination of Mother's parental rights. Mother's claim that she, like B.N.W., is a victim of T.D.W. rings hollow and, more importantly, does not vitiate the evidence in support of termination. If Mother was either unable or unwilling to protect the child from someone who she admits is a sexual deviant, then she should not have custody of the child. If her brush with Mississippi law enforcement did not alert Mother to the fact that her behavior was endangering the welfare of her child, her first arrest in Missouri should have convinced her. Instead, Mother chose to leave her child in the care of T.D.W.—her alleged abuser while she engaged in some forty acts of prostitution. Mother also chose to repeatedly engage in explicit sexual activity in the presence of the minor child. As a result of her exposure to this sexual activity, the minor child, who was diagnosed with post-traumatic stress syndrome, began to act out sexually and to exhibit angry, aggressive behavior. Ultimately, upon the advice of B.N.W.'s therapist, parental visits were disallowed because they invariably triggered additional sexual play and angry outbursts on her part.

We find no error in the trial court's decision to terminate the parental rights of Mother. The judgment is affirmed.

PARRISH, J., and SHRUM, J., concur.